Ed. M. Hummel, Harry W. Hummel and John L. Cooper, Appellants, *v.* Annie C. Kistner and H. U. Kistner, her husband.

*Parent and child—Deed—Evidence.*

Where a father by gifts and conveyances has distributed a portion of his estate to three of his four children, the fourth child, a daughter, who keeps house for her father, may make personal solicitations for conveyances to her, to equalize her share with the others, without being required to furnish explanatory testimony, such as is required of persons occupying confidential relations, who receive large gifts from others.

Where, on a bill in equity, the court below finds upon sufficient evidence that certain conveyances made by a father to his daughter were made in pursuance of a general scheme on the part of the grantor to divide his property in his lifetime equally among his children, the Supreme Court will not upon appeal reverse the finding of the court below.

*Evidence—Declarations—Deed.*

On a bill in equity to set aside a deed made by a father in his lifetime to his daughter, declarations of the deceased to his attorney while he was writing the deed are not privileged, when made in the presence of both parties to the transaction.

Argued May 10, 1897. Appeal, No. 190, Jan. T., 1897, by plaintiffs, from decree of C. P. Snyder Co., Sept. T., 1896, No. 1, dismissing bill in equity. Before GREEN, WILLIAMS, MITCH-ELL, DEAN and FELL, JJ. Affirmed.

Bill in equity by creditors to have certain deeds and assignments adjudged void, because they were given to delay, hinder and defeat plaintiffs.

McCLURE, P. J., found the facts to be as follows:

1. John Hummel, late of Monroe township, Snyder county, Pennsylvania, died April 7, 1896, at the advanced age of seventy-eight years. He left to survive him four children, Emma A., intermarried with John L. Cooper, Annie C., intermarried with H. U. Kistner, Edwin M. and Harry W. Hummel. An active, energetic and frugal man, he had accumulated considerable property. Advanced age and an accident received about June 1894, rendered him somewhat helpless and in need of the care of an attendant to minister to his wants, drive him to town, and

to assist him in the management of his affairs. While his mind was not as strong as formerly, nevertheless he was mentally capable of transacting his business, as far as this record discloses, up to the time of his death.

2. In 1893, Mr. Hummel was the owner of three farms in Monroe township, aforesaid, on one of which he lived, the Keystone Hotel property in Selinsgrove, two tracts of timber land, two shares of bank stock, $2,000 in a mortgage, some personal property, household goods, etc., in all worth about $35,000. His children were all of age, were married and living in homes of their own. He was at this time indebted to his son Harry W., on a note dated September 6, 1893, wherein he promises to pay " Three months after my death $4,000 with interest from date." This indebtedness grew out of some transaction in relation to an oil lease. He was also indebted to his son, Edwin M., for lumber furnished, for which he, on May 7, 1894, gave him a note under seal with warrant of attorney for the confession of judgment thereon for $1,200, payable one day after date, with the stipulation : " This amount not to bear interest." Also to his son-in-law, John L. Cooper, in $1,000, part purchase money for a sawmill bought of Cooper & Carey in March, 1879 for which Cooper held his judgment note. These debts were not paid by John Hummel during his life, and are still unpaid.

3. On the 16th of December, 1893, John Hummel, by deed of that date, for the consideration of $2.00 and natural love and affection, conveyed to his son Harry W., his homestead farm containing eighty-eight acres, more or less, " possession to vest and to be taken by said Harry W. Hummel, grantee, immediately after the death of John Hummel, the grantor herein." May 7, 1894, by deed of that date, each for the consideration of $1.00 and natural love and affection, he conveyed a farm to his son Edwin M. Hummel, and one to his daughter Emma A. Cooper, wife of John L. Cooper. These farms are contiguous, and an engineer was employed to run the line between them, so as to make them equal in acreage and give each seventy-four acres. In addition, Mrs. Cooper's deed conveyed to her an adjoining tract of twelve acres and forty-six perches, and Edwin M. Hummel's deed conveyed to him a tract containing fourteen acres and forty-three perches. In these deeds Mrs. Cooper's land is described as the southern half of a tract of one hundred

and forty-eight acres of the grantor, " The Northern one half being intended for the said Edwin M. Hummel," and Edwin M. Hummel's is described as the northern half, " the Southern half being intended for the said Mrs. Emma Cooper."

May 14 of the same year he assigned to his son Harry W., one half of one third of a mortgage given by Henry Shaffer to John Hummel and others, on a farm in Point township, Northumberland county, to secure $6,000. John Hummel having a one third interest, the amount passed by the assignment was $1,000. This was for a like consideration of $1.00 and natural love and affection.

4. At the time of the execution and delivery of the above deeds to Mrs. Cooper and Edwin M. Hummel, John Hummel, Edwin M. Hummel, Harry W. Hummel and John L. Cooper met at the office of Charles P. Ulrich, Esq., in Selinsgrove. John Hummel asked Mr. Cooper for a note, and when Mr. Cooper handed it to him he tore his name off of it, and in response to Mr. Cooper's inquiry as to why he did that, he replied, " that he didn't care about having his name on papers," and then Mr. Cooper said, " Is Emma to pay more than the rest?" and he said "no," and further said he would pay him the note. John Hummel at this time, and after he had delivered to his son Edwin M., his deed, gave him the note above referred to for $1,200, in payment of his lumber bill. The deed to Mrs. Cooper was delivered to her husband, John L., by Mr. Hummel.

5. By deed dated the 23d of January, 1895, John Hummel conveyed to his daughter Annie C. Kistner, for the consideration named therein of $1.00 and natural love and affection, the Keystone Hotel property in Selinsgrove, " The said party of the first part to have control and the profits of said property during his lifetime." March 18 of the same year he assigned to her two shares of the capital stock of the First National Bank of Selinsgrove, worth $150 per share.

By separate deeds bearing date the 6th day of May, 1895, each for the consideration of $1.00 and " the love and affection which he bears toward the party of the second part," he conveyed to the same child two tracts of woodland, each containing about ten acres of land. The next day he assigned to her his remaining one sixth of the Shaffer mortgage, above referred to

in third finding, and on August 16, 1895, by bill of sale for the consideration named therein of $5.00, he sold her a horse, mule, harness, wagons, sleighs, poultry, etc., and all household goods in and about the house, worth about $400. April 13, 1895, he transferred to Mrs. Kistner's account the balance of $723.14, then on deposit in the First National Bank of Selinsgrove. This, however, was not for her benefit, but to be used in his own business affairs by her.

6. No valuable consideration moved to the grantor for any of the above assignments, transfers or conveyances, and by them all the real estate except a life interest in the hotel and homestead farm and all the personal property and assets of John Hummel, except a few articles included in the inventory and appraisement, which all told amounted to but $179.75, passed into the hands and custody of his children. The several farms conveyed to Harry W. Hummel, Ed. M. Hummel and Emma A. Cooper were worth, at the time they received their deeds about $100 per acre, and adjoining tracts of twelve and fourteen acres of Ed. M. Hummel and Mrs. Cooper were worth $75.00 per acre. Harry therefore received land worth from $8,500 to $9,000 in value, and $1,000 of a mortgage. Ed. M. and Mrs. Cooper land of from $8,000 to $8,500 in value. Mrs. Kistner's hotel property was worth at the time of the conveyance about $7,000, the woodland $330 the personal property, household goods, etc., about $400, the bank stock $300, which with the $1,000 of the Shaffer mortgage makes in all about $9,000 her father gave to her.

7. There was some testimony introduced to prove that some of the children had been the recipients of their father's bounty before the conveyances above set forth were made, viz: That Mr. and Mrs. Cooper had lived on the farm deeded to them for twenty years or more; that Ed. M. Hummel had assigned to him a judgment of Drumhellers against H. U. Kistner and Benjamin Kistner, and that Mr. Hummel had given Mr. and Mrs. Kistner more than the latter's share of his estate. But there was nothing to show what the arrangements were as to the crops and accounting therefor by the Coopers, and we are inclined to the belief that the Drumheller judgment was assigned in a business transaction, and was not intended as an advancement to Ed. M. on account of his share in his father's estate. The proof

that Mrs. Kistner had received her share, was confined to the declarations of John Hummel, made in her absence; and as they were in no way against his interest, they were not admissible for this purpose, and to his declaration to Mrs. Kistner, as testified by Polly Maurer, that she had $12,000, and run through it all. According to Polly, Mrs. Kistner flatly denied ever receiving it. And Mrs. Kistner says no such conversations ever were had,—Polly's testimony is open to criticism. She swears positively she never told anyone before, or after, she was subpœnaed, and nobody asked her about the conversations. There were three people in the room, Mr. Hummel, who died before this controversy arose, Mrs. Kistner and the witness, and yet somehow or other she is called to prove these two facts, and them alone. We have not sufficient evidence before us to warrant us in finding that Mr. Hummel gave his daughter $12,000. Even if he did, in the view we take, it would not affect the result of the case.

8. In 1894, Ed. M. Hummel lived in Selinsgrove, Mr. and Mrs. Cooper either there or in Monroe township, Harry W., in Northumberland, and Mr. and Mrs. Kistner in Bordentown, N. J. In March of that year the Kistners moved from Bordentown to Snyder county, and went to live with her father. Whether they came for the purpose of taking care of the old gentleman or were driven there by adverse circumstances, is immaterial. Certain it is they were poor financially, and it is equally certain that Mrs. Kistner cared for her old father and ministered to his wants, from that time on to the time of his death in 1896. He was weak physically and needed help to get around. She drove him to town, helped him in and out of his buggy, and assisted him in his business matters. He transferred his bank account and kept it in her name. She drew checks upon it, so far as the evidence shows, for his debts and obligations, and for those alone while he lived, and to pay for his casket after his death. Her poverty is sufficient proof that the checks so given were not drawn upon any other fund than that of her father's.

9. John Hummel had made a will, and early in June, 1894, one month after he had conveyed the farms to Mrs. Cooper and Ed. M. Hummel, he, with Mr. and Mrs. Cooper and Mrs. Kistner, was at Harry W. Hummel's in Northumberland. He had

gone there with the evident purpose of preparing a codicil to his will, and gave instructions to J. Simpson Kline, Esq., in the presence of the others, as to the disposition of his property. No mention was made of the notes held by his children, but he directed his debts to be paid first. The bank stock and $500 in money were to go to Annie instead of Alice Klase, who had been his housekeeper, as provided in the will, also the horse and phaeton and all the rest of his property to Harry W. Hummel, in trust, to pay to Annie the income during her life, and the principal to her children at her death. The testimony is conflicting as to whether the Keystone Hotel was mentioned. We do not think it of much importance whether it was or not. It is evident that the sole purpose of adding a codicil to the will was to provide for Mrs. Kistner. The other children had just been given their conveyances, and there remained but one fourth of the estate. If the old gentleman contemplated the payment of the notes of Harry W., Ed. M. and Mrs. Cooper out of this, there was little use in raising a trust for his daughter. This whole matter we consider relevant to the issue, only as shedding light on the motive that prompted Mr. Hummel to make the conveyances to Annie. As no will was found after his death, and all his property had been transferred to his children, the presumption is he destroyed it.

10. When John Hummel made the conveyances and transfers aforesaid, he had long passed threescore and ten, and could hope to live but a few years more. His evident purpose was to distribute his property among his children before his death. His actions can be explained on no other reasonable hypothesis. He granted his homestead farm to his son Harry W., but reserved the possession and enjoyment thereof to himself during life. Another farm of about equal value he conveyed to his daughter, Mary (Emma) A. Cooper, and described it as "Bounded on the north by land intended for Edwin M. Hummel." A third of almost equal value he granted to his son, Edwin M., and described it as "Bounded on the south by land of the grantor intended for Mrs. Emma Cooper." That equality was in his mind is further evidenced by the fact that he had a surveyor run the lines between these two last farms so that they would have equal acreage. Ed. M. and Mrs. Cooper went into immediate possession, while Harry's enjoyment of his farm was post-

poned until after his father's death.    Tending to equalize this.
$1,000 of a mortgage was assigned to Harry one week after the
conveyances to the others.    The consideration for all was nat-
ural love and affection.    Mrs. Kistner received property of
about the value of that conveyed to each of the other children,
and for the same consideration.    As in the deed to his son
Harry W., he reserved to himself the control and the rent of
the Keystone Hotel during his life; and, as he did to Harry, he
gave her $1,000 of the Shaffer mortgage.    If it be said that by
the transfers of the bank stock and sale of personal property to
her she received several hundred dollars more than her share,
this is only in harmony with her father's instructions for the
drawing of the codicil to his will, viz : that Mrs. Kistner was
to have $500 in money and the bank stock bequeathed in the
will to his former housekeeper.    Mrs. Kistner was then his house-
keeper, and to her as such it is evident this bequest was to be
made.    Thus keeping a home on his farm for himself, with
its products and the rent of the hotel for his maintenance and
support, he distributed almost his entire estate among his chil-
dren.    This distribution was an equitable one, indeed, it would
be difficult to point out now in what way he could have more
evenly divided up his property.

11. It is contended that by the assignments and conveyances to
Mrs. Kistner, John Hummel undertook to divest himself of his
entire estate, and that the same were made by him, and accepted
by the defendants, in collusion among themselves to hinder and
prevent the collection and payment of the indebtedness due the
plaintiffs ; that there was fraud in law and fraud in fact.

We find no fraud in fact, we think as above set forth the
motive to have been the equal distribution of all his estate
among his children.    While Mr. Hummel declared that he was
not going to give the Kistners anything, that they had already
received $12,000, etc., he surely changed his mind, for the plain-
tiffs themselves proved his directions for the creation of a trust,
of all the balance of his estate, after his debts were paid, for his
daughter Annie and her children.    His declarations of having
given the Kistners $12,000 in their absence, were not evidence
that he had furnished them that or any other amount of money,
but they were evidence quo animo the conveyances to his daugh-
ter were made : Levering v. Rittenhouse, 4 Wharton, 130.

We are moreover of the opinion that when Mr. Hummel was creating a trust for Mrs. Kistner of the residue of his estate, after his debts were paid, he did not contemplate that his debts to the plaintiffs should come out of that portion of his estate then in his hands. He had well provided for three of his children, a fourth remained who was poor, dependent, and caring for him in his old age. Was it unreasonable that she should be put as near as possible on an equal footing with the others? And yet, if the plaintiffs' notes for $6,200 were to be first paid, little use was there for a trustee for herself and children. As evidencing his intention, we have his declaration to Peter Bailey, shortly after he had given deeds to his sons, that "He had given the boys deeds and Annie Kistner had to have something too." He also said to R. C. Fiss, when acknowledging one of the deeds to Mrs. Kistner, "That he had deeded (or intended to deed), farms to his other children, and he thought he ought to give Annie some property." And to Harvey E. Miller at the time the deed for the Keystone Hotel was prepared that "He had given deeds to the other children and now he thought he would give a deed to Mrs. Kistner." He also wanted the consideration the same, $1.00 and natural love and affection, and further said "That he had made some provision for Annie Kistner in his will, but that since he had given deeds to the other children, he wanted to give her a deed for this property." While these declarations would not affect the rights of his prior grantees, Miller's Appeal, 107 Pa. 221, those to Mr. Fiss and Mr. Miller were part of the res gestæ, and bear strongly on the motive prompting the conveyances to Annie Kistner. He had advanced to the others and thought he ought to advance to her: 1 Am. & Eng. Ency. of Law (2d ed.), 776; Levering v. Rittenhouse, 4 Wharton, 130; Dutch's App., 57 Pa. 461; Merkel's App., 89 Pa. 340. Again he showed no fear of his creditors. Having given his three children property worth $25,000, while his total indebtedness to his sons and his daughter's husband was but $6,200, he didn't deal with them as one usually does with a creditor. He seemed to control matters, made one note payable three months after his death, another without interest, and tore his signature off of the third, with the remark, that "He didn't care to have his name on papers." Showing no fear of his children as creditors, knowing he had just advanced them four times the amount of his debts, why should

he convey his property to defeat a recovery? That he did not is further evidenced by the reservation to himself for life of the possession, control, rents and profits of his homestead farm and the Keystone Hotel. The deed for the hotel was recorded February 26, 1895; those for the woodland, May 16, and the assignment of the mortgage to Mrs. Kistner, May 7, of the same year. Although John Hummel lived until April 7, 1896, no move was made by these creditors in his lifetime to contest the bona fides of the advancements. Not until his mouth is sealed in death are these charges of fraud and collusion brought against him. A post obitum attack indicates a wholesome fear of the living, and a pertinent inquiry here is, why, if gross fraud was perpetrated upon them, did not these plaintiffs at once seek redress for their wrongs? Mr. Hummel's declaration to J. Simpson Kline that "He was going to convey (or dispose of) all his property so that Ed. should not have anything more," is as consistent with the theory that he was advancing to his children all of his estate, as that he was endeavoring to defeat his son's rights as a creditor.

12. The plaintiffs have neither contributed nor offered to contribute any money towards the payment of the debts of John Hummel, before the filing of this bill or since. At the hearing, defendants through their counsel, expressed their readiness and willingness to pay their proportionate share of his debts, whenever called upon to do so.

The court entered a decree dismissing the bill.

*Error assigned* among others was decree dismissing bill.

*Chas. P. Ulrich* and *A. W. Potter*, with them *J. Simpson Kline*, for appellants, cited Cox v. Cox, 26 Pa. 375; Moore v. Bray, 10 Pa. 519; Darlington's Est., 147 Pa. 624; Worrall's App., 110 Pa. 349.

*Geo. B. Reminsnyder*, with him *Charles Hower*, for appellee, cited Clowes v. Dickinson, 5 Johns. Ch. 235; Graff v. Smith, 1 Dallas, 481; Phillips v. Gregg, 10 Watts, 158; Christy's App., 1 Grant, 369; Christman v. Siegfried, 5 W. & S. 400; Patterson's App., 128 Pa. 269; Meter Co.'s App., 117 Pa. 514.

PER CURIAM, July 15, 1897:

It is impossible to read the testimony in this case without

attaining the conviction that the several deeds and conveyances made by John Hummel to his children, including Mrs. Kistner, were made and intended by him as a distribution of his estate in his lifetime. The values of the several properties conveyed were nearly equal, and the facts and circumstances attending the preparation and execution of the several deeds are absolutely convincing that such was his purpose. The learned court below has so found as a fact, and we entirely approve of the finding. The declarations of the deceased to the scrivener who wrote the deed for one of the properties to Mrs. Kistner were not privileged, being made in the presence of both parties to the transaction. As a matter of course there was nothing in the testimony to justify a finding of fraud in the execution of the deeds, and the court has so found. Neither is there anything sufficing to bring the conveyances to Mrs. Kistner within the rule which prohibits large gifts to persons occupying confidential relations with the donors without explanatory evidence. As a daughter of the donor, Mrs. Kistner might make personal solicitations for conveyances to her, especially as her brothers and sisters had already received similar deeds, without being required to furnish explanatory testimony. We are entirely satisfied with the disposition of the case made by the learned court below.

Decree affirmed and appeal dismissed at the cost of the appellants.