### YORK v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. May 19, 1915.)

No. 4300.

*(Syllabus by the Court.)*

1. WITNESSES ☞201—PRIVILEGED COMMUNICATION—ATTORNEYS:
   Confidential information, which a client is induced to give to his attorney by that relation, which is relevant to the subject of the latter's professional engagement, and necessary and proper to enable him to perform his office of attorney in relation to that subject, is a privileged communication, which he may not be required to disclose.
   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 754, 755; Dec. Dig. ☞201.]

2. WITNESSES ☞199—"PRIVILEGED COMMUNICATION"—ATTORNEYS.
   Indispensable elements of a "privileged communication" between attorney and client are (1) the professional relation of attorney and client at the very time the communication is made, (2) the making of the communication on account of that relation, and (3) the necessity or relevancy of the communication to the subject of the attorney's professional engagement in order to enable him to use his ability, skill, and learning in the discharge of his office as attorney in relation thereto.
   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 749–751, 766, 767; Dec. Dig. ☞199.
   For other definitions, see Words and Phrases, First and Second Series, Privileged Communication.]

3. WITNESSES ☞206—PRIVILEGED COMMUNICATION—ATTORNEY AND CLIENT—PRESENCE OF THIRD PERSON.
   The presence of a third party at the time of a communication between client and attorney, particularly if he is an opposing party, indicates that the communication is not privileged or confidential.
   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 761, 764, 765; Dec. Dig. ☞206.]

In Error to the District Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

G. H. York was convicted of inducing a woman to go from one state to another in interstate commerce, for immoral purposes, and brings error. Reversed and remanded, with directions to grant a new trial.

G. M. Tripp, of Colfax, Iowa (Tripp & Tripp, of Colfax, Iowa, and Parsons & Mills, of Des Moines, Iowa, on the brief), for plaintiff in error.

Claude R. Porter, U. S. Atty., of Centerville, Iowa.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before SANBORN and CARLAND, Circuit Judges, and AMIDON, District Judge.

SANBORN, Circuit Judge. The plaintiff in error, the defendant below, was indicted, tried, convicted, and sentenced to imprisonment for a year and a day on the charge that he induced and caused Mrs. Jackson to go from Kansas City, Mo., in interstate commerce as a passenger on a train of the Chicago Great Western Railroad Company, a common carrier, to Des Moines, Iowa, for the purpose of prostitution, debauchery, and other immoral purposes. There was evidence at the trial that in April, 1913, Mrs. Jackson was living in Kansas City, Mo., that on April 11, 1913, and again on December 1, 1913, the defendant and Mrs. Jackson were registered, and occupied rooms together, at the Savery Hotel in Des Moines; that the dead body of one Wheelock was found in or near Des Moines about December 2, 1913, and some suspicion arose that the defendant had killed him on the night of December 1, 1913. There was also evidence that Mrs. Jackson, in order to protect him from a possible charge of manslaughter or murder, had told the coroner and the district attorney at Des Moines that he spent the night with her at the Savery Hotel. There was evidence that on April 17, 1913, she went from Kansas City to Des Moines. She testified that the defendant asked her to go to Des Moines, and sent her $15 between July, 1912, and April, 1913, and that afterwards in August, 1913, she moved to Des Moines and went into the millinery business there. The defendant testified, on the other hand, that he never asked her to come to Des Moines and never sent her a dollar. The uncontradicted testimony of Mrs. Jackson and Mr. Mulvaney was that, some time after Mrs. Jackson had told the coroner and district attorney that the defendant spent the night of December 1, 1913, with her, she went to Mr. Mulvaney, who was, and for some time had been, the attorney of the defendant, and who she knew was his attorney, told him that her business was gone, and asked him whether or not she should return to Kansas City; that some time afterwards she went to Kansas City, was thereafter arrested on a certain Friday, and released on the following Monday. After Mrs. Jackson had testified that the plaintiff in error had paid her $15 between July, 1912, and April, 1913, and asked her to go to Des Moines in April, 1913, she testified that on the Monday after her arrest Mr. Mulvaney came to the jail where she was confined and got her released, that she knew Mrs. Monday, the police matron there, and that Mrs. Monday was present part of the time when she had a talk with Mr. Mulvaney. Her cross-examination then proceeded in this way:

"Q. Didn't you say there to Mr. Mulvaney, in the presence and hearing of Mr. Gresham and Mrs. Monday, the police matron, that Mr. York had never given you any money to come to Des Moines; that Mr. York had never furnished you transportation from Kansas City to Des Moines? A. No, sir; I don't remember anything of that kind. Q. Or that in substance? A. No, sir. Q. Didn't you further state, in the presence of Mr. Mulvaney, Mr. Gresham, and Mrs. Monday, that Mr. York didn't have anything at all to do with your coming from Kansas City, Mo., to Des Moines, Iowa; that you came of your own free will and at your own expense? A. If I said anything of that kind, it was in August; for I did come here at that time of my own free

will and expense, when I moved here. Q. Did you not say to them that Mr. York never had contributed any money, and that when you came you always came of your own free will and at your own expense? A. No, sir. Q. And that you came up here to go into the millinery business?"

After the testimony for the government had been closed, Mr. Mulvaney testified on behalf of the defendant that he lived in Des Moines, that he was the defendant's attorney, that Mrs. Jackson knew he was the defendant's attorney, and for that reason came to him to ask about her going to Kansas City, that he went to Kansas City after her arrest there, as the defendant's attorney, to secure her release, that he did not go there to consult Mrs. Jackson, or as her attorney to procure her release, that he did not have any conversation with her about getting her release, that after he had obtained permission for her release from the United States marshal and the chief of police he talked with Mrs. Jackson in the presence of the officers, and thereupon the court below sustained the objection that the conversation referred to in the following questions constituted a privileged communication and was therefore not competent evidence:

"Q. * * * Is it or is it not a fact that in that conversation in the jail there in Kansas City, Mo., in the presence of Mrs. Monday, the police matron, and Officer Gresham of the police force of Kansas City, Mrs. Jackson said to you in substance that Mr. York never sent her any money to come to Des Moines at any time, and that she came to Des Moines on her own business? * * * I will ask you whether it was after she had been released that you talked with her as York's attorney and had the conversation I have just asked about."

[1-3] "The general rule" said Mr. Justice Story in Chirac v. Reinicker, 11 Wheat. 278, 294, 6 L. Ed. 474, "is not disputed that confidential communications between client and attorney are not to be revealed at any time. The privilege, indeed, is not that of the attorney, but of the client; and it is indispensable for the purposes of private justice. Whatever facts, therefore, are communicated by a client to counsel, solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent. The real dispute in this case is whether the question did involve the disclosure of professional confidence." And that is the question in the case at bar. Indispensable elements of a privileged communication between attorney and client are: (1) The professional relation of attorney and client at the very time the communication is made (Harless v. Harless, 144 Ind. 196, 41 N. E. 592, 594; Brady v. State, 39 Neb. 529, 532, 533, 58 N. W. 161; Farley v. Peebles, 50 Neb. 723, 728, 70 N. W. 231; Turner's Estate, 167 Pa. 609, 610, 31 Atl. 867); (2) the making of the communication on account of that relation (Chirac v. Reinicker, 11 Wheat. 278, 294, 6 L. Ed. 474); and (3) the necessity or relevancy of the communication to the subject-matter of the attorney's engagement, in order to enable him to use his ability, skill, and learning in the discharge of his office of attorney in relation thereto. 1 Greenleaf on Evidence (16th Ed.) § 244; Jones on Evidence (2d Ed.) § 751; Denunzio's Receiver v. Scholtz, 117 Ky. 182, 77 S. W. 715, 716, 4 Ann. Cas. 529.

The evidence rejected was proper impeaching testimony, unless it constituted a privileged communication. It was therefore competent,

unless the evidence in the case when the communication was rejected established the fact that it possessed the three essential elements of the confidential communication. Did it establish that fact? Mrs. Jackson testified that she came to Des Moines in August, 1913, and went into the millinery business; that some time after December 1, 1913, she had given up that business; that she knew Mr. Mulvaney was the attorney of the defendant; that she went to him at Des Moines, "and employed him as my lawyer. I knew Mr. Mulvaney was York's attorney, went to see him, told him my business in Des Moines was gone, and asked him about going to Kansas City." She did not testify that she employed him in regard to any other matter than the question whether or not, in view of the loss of her business, she should return to Kansas City. Mulvaney testified that afterwards, when at Kansas City he procured her release from arrest, and when thereafter the communication in question was made by her, he had gone there and procured her release as the attorney for the defendant; that he did not go there to consult Mrs. Jackson, did not procure her release as her attorney, and did not have any conversation with her in connection with her release. One or two persons besides Mrs. Jackson and Mr. Mulvaney were present when the communication rejected was made, and the presence of a third party, particularly if he is an opposing party, indicates that the communication is not confidential or privileged. 1 Greenleaf on Evidence (16th Ed.) § 246; Goddard v. Gardner, 28 Conn. 172, 174, 175; People v. Buchanan, 145 N. Y. 1, 26, 39 N. E. 846; Hummel v. Kistner, 182 Pa. 216, 37 Atl. 815, 816; Wyland v. Griffith, 96 Iowa, 24, 27, 64 N. W. 673; David Adler & Sons Clothing Co. v. Hellman, 55 Neb. 266, 75 N. W. 877, 883. There is no escape from the conclusion, when the evidence in this case is carefully considered and analyzed, that there was no substantial testimony at the trial that the relation of attorney and client existed between Mrs. Jackson and Mr. Mulvaney at the time of the communication, that the communication was made by Mrs. Jackson on account of that relation, or that it was either necessary or relevant to the subject-matter of any such relation between them, or to its consideration or treatment. The communication rejected, therefore, was not privileged, and it was a fatal error to deny the defendant an opportunity to prove it.

This conclusion renders it unnecessary to consider other questions discussed by counsel in their briefs. Let the judgment below be reversed, and let the case be remanded to the court below, with directions to grant a new trial.