In re WILL OF SWARTZ.
GLEASON et al. v. JONES.

No. 9535—Opinion Filed July 6, 1920.

Rehearing Denied Sept. 14, 1920.

(Syllabus by the Court.)

1. **Witnesses—Confidential Relations—Physician and Patient.**

Paragraph 6 of section 5050, Rev. Laws 1910, providing that a physician or surgeon shall be incompetent to testify concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of such patient, does not apply when the circumstances surrounding the communication or knowledge obtained by personal examination were such as to show that what was said or discovered on the occasion was not intended to be confidential, and especially when third persons were present and heard all that was said between the deceased and the physician and the knowledge obtained by a personal examination was as patent to the third persons as it was to the physician.

2. **Wills—Undue Influence—Facts Not Constituting.**

A devise to one associated with testatrix in an immoral environment and the presence

·of the devisee in the room where testatrix was instructing her lawyer as to the disposition she wished to make of her property, the lawyer being at the time engaged in drafting the will, would not, because of the immorality of the association or the presence of the devisee standing alone, give rise to an inference of undue influence exerted by the devisee over the testatrix.

### 3. Same.

Undue influence such as will invalidate a will must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence; but, in order to constitute undue influence, it must be used directly to procure the will and must amount to coercion, destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will.

Error from District Court, Okmulgee County; Ernest B. Hughes, Judge.

In the matter of the probate of the will of Frances Swartz, deceased; Marguerite Gleason and W. E. Peak, proponents, and M. W. (Wesley) Jones, contestant. Judgment for contestant, and proponents bring error. Reversed and remanded, with directions.

G. R. Horner and Dudley C. Monk, for plaintiff in error.

I. H. Cox and Fred B. Ropkey, for defendant in error.

PITCHFORD, J. This case comes on appeal from the district court of Okmulgee county in denying to probate the will of Frances Swartz. The record discloses that Frances Swartz resided in the city of Henryetta, Oklahoma. Sometime prior to and at her death she was engaged in conducting a house of prostitution. For sometime preceding the execution of the instrument sought to be probated as her will, she had been under the care of Dr. Robinson, suffering from an attack of jaundice. Early Sunday morning, April 9, 1916, the doctor was called in and found that the disease had reached an acute stage, and informed her of her serious condition, and further impressed upon her the fact that there was no hope for her recovery.

Someone in the house telephoned Mr. Axline, an attorney of Henryetta, and informed him that his services were wanted in the preparation of a will. He immediately responded and the will was executed, devising to Marguerite Gleason and W. E. Peak, two of the inmates of the house, certain real estate, the same being the house occupied by the deceased, together with the furniture therein contained, of a total value of $2,968.75, and real estate of the value of $600 was devised to Wesley Jones, a brother of the testatrix, residing in Peoria, Ill. The testatrix died on the following morning. Claims filed against the estate amount to $3,200. When the will was offered for probate in the county court of Okmulgee county, the brother filed a contest, and the court, after hearing the evidence, admitted the will to probate. An appeal was taken by the contestant to the district court of Okmulgee county, and judgment was there rendered in favor of the contestant, on the ground that the will was procured by undue influence exercised by the proponents over the testatrix. From the judgment of the district court the proponents appeal and assign as error, first, that the court erred in permitting Dr. Robinson, the physician, to testify as a witness; second, error in finding that the associations of the testatrix with the proponents in an immoral environment and the presence of the proponents of the will in the room at the execution of the will were sufficient to infer undue influence.

Section 5050, Rev. Laws 1910, provides:

"The following persons shall be incompetent to testify: * * * 6th. A physician or surgeon, concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of such patient. * * *"

The application of this statute to the testimony of a physician in a will contest seems to have never been considered by this court, nor do we deem it necessary to pass upon the question in this case, further than to say that we appreciate the objects the lawmakers must have had in view in enacting the statute. A patient should be encouraged to give the attending physician full and complete information as to his physical infirmities in order that the physician may have a better knowledge of the physical condition of his patient, and thereby be placed in a better position to give a more intelligent treatment.

A patient is encouraged to speak freely to his physician, realizing that everything said is in strict confidence, and the statute safeguarding him against the possibility of his feelings being shocked or his reputation ruined, he may be absolutely frank with his physician. A like privilege exists between attorney and client, and priest or clergyman concerning any confession made to him in his professional character. These communica-

tions are made privileged by reason of the relationship of the parties, supposed to be made under absolute privacy, and made alone to the attorney, clergyman or priest, or physician. But we do not understand that the privilege obtains when all the circumstances show that the communications made or information obtained were made or obtained in the presence of third persons. In the instant case the matters testified to by the physician were not obtained by reason of his knowledge as a physician, but rather by a knowledge equally possessed by the laity. All the physician testified to was as to her condition, that she was suffering with jaundice; the other parties in the room knew just as well as the physician that the testatrix was suffering with this disease. The average man or woman can as easily tell when one is suffering with jaundice as they can when the party is suffering from an ordinary cold. It is true, however, that the lay mind would probably not know the far-reaching effects of jaundice, nor would it know the far-reaching effects of the ordinary cold.

Conceding, however, but not deciding, that if the physician and the deceased had been alone, and it appeared that what was said by the patient was intended to be confidential, or if the physician found it necessary to examine the person of the patient, then there would be some reason for claiming that the veil of secrecy should be thrown over these communications and discoveries. But when the circumstances surrounding the visit were such as to show that what was said on the occasion was not intended to be in confidence, and especially when third persons were present and heard all that was said between the deceased and the physician, the statutory provision is inapplicable.

In 40 Cyc., title "Witnesses," page 2377, it is said:

"There is no privilege as to a communication between attorney and client in the presence of a third person. * * * "

In Bauman v. Steinjester, 213 N. Y. 328, 107 N. E. 578, decided January 5, 1915, the facts were that one Maria Shadrick, with a companion, Mrs. Steinfohld, went to the office of her attorney and, in the presence of Mrs. Steinfohld, gave directions for the drawing of her will. After her death, a contest was instituted and the attorney was called as a witness and asked concerning these directions. The court excluded the evidence as confidential communication. This was held error by the Court of Appeals.

In Scott v. Altman Co., 211 Ill. 612, 71 N. E. 1112, 103 Am. St. Rep. 215, it is said:

"Statements made by clients in the presence of third parties, or of the opposite party

and his solicitors, are not of that confidential nature which the client may insist shall not be disclosed by an attorney or solicitor."

In Ruiz v. Dow, 113 Cal. 490, 45 Pac. 867, there was at issue the question of a gift. The deceased donor had made certain statements to his attorney in the presence of the donee. It was held that under these circumstances the conversation between them—that is, the attorney and the decedent—was not confidential in the sense contemplated by the statute.

In Mobile & Montgomery Railway Company v Yeates, 67 Ala. 164, the rule is thus laid down:

"Professional communications between attorney and client are regarded as confidential and are protected on grounds of public policy; but the rule does not extend to communications openly made in the presence of third persons; * * * "

In Elliott v. Elliott (Neb.) 92 N. W. 1006, there was admitted the conversation of an attorney with reference to drawing a contested will of a deceased client. This conversation took place in the presence of the witnesses. The court said, relative to its admission:

"It is not probable that any part of the conversation was in the nature of a confidential communication. It appears to have taken place for the most part in the presence of the other two witnesses, and with no injunction to secrecy. In Hills v. State, 61 Neb. 595, 85 N. W. 836, 57 L. R. A. 155, it is said: 'The mere fact that a communication is made to a lawyer, a doctor, or a priest does not of itself make such communication privileged. To have that effect it must have been made in confidence of the relation and under such circumstances as to imply that it should forever remain a secret in the breast of the confidential advisor.' "

To the same effect, see Masons Union Life Insurance Association v. Brockman (Ind.) 59 N E. 401; Hummel v. Kistner (Penn.) 37 Atl. 815.

In Jones' Commentaries on the Law of Evidence in Civil Cases (Horwitz Revision) otherwise known as the Bluebook of Evidence, section 761, pages 575-576, vol. 4, the rule is laid down as follows:

"As to the effect on the privilege of the patient or physician, it needs no consideration to say that if those third persons are necessarily present as assistants, there can be no question that the privilege is untouched. But when they are merely casually present, their very presence neutralizes the confidential character of the interviews and the privilege should not attach."

There was no error in admitting the evidence of Dr. Robinson.

The second proposition contended for by the plaintiffs in error is that a devise to one associated with testatrix in an immoral environment does not, because of the immorality of the association and the presence of the beneficiaries at the time the will is executed, give rise to an inference of undue influence exercised by the devisees over testatrix.

The trial court found that there was no direct and positive evidence that the will was made at the suggestion of either Marguerite Gleason or W. E. Peak, and that the only way the court could arrive at the proposition as to whether or not there was undue influence exercised or whether the will was written at their suggestion would be to make ascertainment from the circumstances surrounding the making of the will. He found that the proponents of the will were present at the time of the writing of the will, and that, at the time, the decedent was in a very weak condition, both mentally and physically. The court did not find that the testatrix was not of disposing mind and memory at the time she made the will, but did find that at the time of the making of the will the testatrix was unduly influenced by the proponents. He found that such undue influence arose to a great extent from the illegal and licentious relationship existing among the inmates of the house; that at the time of her death her mind was in such condition as to be easily influenced by suggestion, and, under the particular circumstances of this case, taking everything into consideration, the relationship of the parties, the character of the business in which they were engaged, the fact that both of the principal beneficiaries and proponents of the will were present at the bedside at the time the will was written, and the fact that one of them, the principal beneficiary under the will, to wit, Marguerite Gleason, had only been acquainted with the decedent a few months, the court was of the opinion that at the time of the execution of the will the testatrix was unfairly and unduly influenced in making it by the two principal beneficiaries, and, therefore, that the instrument presented for probate was not the will of Frances Swartz.

Conceding that the environments of the decedent and the proponents were immoral, that fact did not deprive Frances Swartz of the right to say in life what the disposition of her property should be after death. The property was her own; she had the right to sell it or give it away. The court did not find that the testatrix was not of disposing mind, neither did he base his judgment in refusing to probate the will upon that ground, but upon the ground that she was influenced by the suggestions of the proponents. We have made a careful search of the record and have been unable to find where either of the

proponents ever at any time used the least influence on the testatrix to induce her to execute the will as she did; not even the remotest suggestion on their part is shown. Therefore, we are confronted with this proposition: Does the fact that the testatrix was the mistress of a house of ill fame deprive her of testamentary capacity in the event the beneficiaries of her will happen to be inmates of the house conducted by her as such? Does the lack of morality forfeit her right to devise her property as conferred by statute? And if her occupation does not deprive her of this right, is she limited to those who are respectable members of society? It is true that the testatrix and the proponents of the will had become social outcasts, and had wandered far from the paths of rectitude—brought to this condition, in all probability by the passions of some lecherous, unprincipled, lying man. Here we are reminded that a man may wander afar from the paths of virtue and right living; he may commit many offenses against the moral law; he may feed upon the husks of degradation; but when we see evidence of reformation on his part, every one delights in giving him a word of encouragement. On the other hand, when a poor, unfortunate woman, in almost every instance the victim of misplaced confidence in some man, makes an effort to reform, attempts to regain a respectable position in society, we find the back of almost every hand turned against her. She is shunned by people of respectability; she has no one to associate with except those who, like her, have departed from a life of virtue. Is it to be expected, then, when she comes to her deathbed and her spirit takes its flight, to appear before the Infallible Bar, where we hope that mercy will be shown her because of the fact that the sins of such are largely brought about by a confiding trust in some man, that the pillars of society will be present to administer to her last wants or close her eyes in death? Must we say that, because the proponents of this will were at the bedside of the testatrix at the time of her death, drawn together by their common social ban, compelled to administer, each to the other, this is a circumstance from which alone we must draw a conclusion of undue influence exercised over the testatrix? The testatrix had cast her lot among these kind of people; they were of her world; her days were lived among them; she died among them. Under all the circumstances of the instant case, we are not prepared to say that the proponents would be the unnatural objects of the bounty of the testatrix, Frances Swartz.

We have not been cited to any authority directly in point upon this question, nor have we been able to find any; however, we have

decisions of this court shedding some light upon the point.

In re Cook's Estate, 71 Oklahoma, 175 Pac. 507, the testator had been married. He and his wife had separated; his wife had gone to live with her people, and he lived at home with his mother. After his death, and when his will was offered for probate, his wife filed a contest alleging undue influence on the part of his mother, who was the principal beneficiary under the will. There was no direct or positive evidence adduced disclosing any effort made by the mother to induce the testator to will the property to her. The trial court, however, deduced from the evidence that the testator lived with his mother, together with the fact of his being separated from his wife and all the circumstances surrounding the testator at the execution of the will, that undue influence could be inferred. Upon appeal to this court, Kane, J., delivering the opinion, said:

"Undue influence such as will invalidate a will must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence not brought to bear on the testamentary act, is not undue influence; but in order to constitute undue influence it must be used directly to procure the will and must amount to coercion, destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will. Estate of Keegan, 139 Cal. 123, 72 Pac. 828; McCullock v. Campbell, 49 Ark. 367, 5 S. W. 590; Westcott v. Sheppard, 51 N. J. Eq. 315, 25 Atl. 254, 30 Atl. 428. It is true from the nature of the subject that proof of undue influence is necessarily largely or wholly circumstantial, and the contestant is not confined to the facts which he may be able to adduce, but is entitled to all the natural inferences which may be derived from established facts. But the will of a person found to be possessed of sound mind and memory ought not to be set aside on evidence tending to show only a possibility of undue influence. The express intentions of the testator should not be thwarted without clear reason therefor. The right to make a will includes the right to make it according to the testator's own desires, subject only to the statutory restrictions. Unequal or unnatural provisions in themselves raise no presumption of undue influence. They may be considered with other evidence in determining the question, 'Is this the testator's will?' but they do not shift the burden of proof and, in the absence of proof that undue influence has been exercised, they have no weight. If the will is expressive of the testator's wishes, lawfully made, the opinions of other persons, however they may condemn its motive or disapprove its scheme, cannot, in any way, rightfully control his power to do with his own as he pleases, without impairing one of the incidents which give to every man's property its value. * * * "

In Clapp v. Fullerton, 34 N. Y. 190, it is said:

"The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust."

In Potter v. Jones, 20 Ore. 239, 25 Pac. 769, it was said:

"It may be harsh, and, under some circumstances cruel, to disinherit one child, and to distribute the estate among the others; but if the testator be of sound mind, and execute his will as prescribed by law, no court can interfere."

In re McDevitt, 95 Cal. 17, 30 Pac. 101, it was said:

"But the right to dispose of one's property by law is most solemnly assured by law, and is a most valuable incident to ownership and does not depend upon its judicious use. The beneficiaries of a will are as much entitled to protection as any other property owners, and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper."

In Boughton v. Knight, 6 Moak. Eng. R. 349, Sir John Hannen said:

"He may disinherit, either wholly or partially, his children, and leave his property to strangers, to gratify his spite, or charities to gratify his pride, and we must give effect to his will, however much we may condemn the course he has pursued."

In determining whether the testatrix at the time of the execution of the will was free from undue influence, her declarations as to her intended disposition of her property made prior to the execution of the will are very important. The court found:

"There is no direct and positive testimony in this case upon the proposition that this will was made at the suggestion of either of the two beneficiaries who are proponents of the will. In other words, I say there is no direct testimony upon that proposition, and the only way that the court may arrive at the proposition as to whether or not there was such undue influence exercised or whether this will was written at the suggestion of the two beneficiaries if it were necessary for the court to decide that point, the court would have to

ascertain that from the circumstances surrounding the making of the will."

As we have heretofore stated, the evidence absolutely fails to show that either of the proponents did or said anything at any time to influence the testatrix.

Prior to the illness of the testatrix, she stated to Mrs. Flossie Parker, who is shown to be a disinterested witness, that she did not want her brother to have anything that she had; that he had never treated her right when she needed his help. This witness, Mrs. Parker, keeps a little store in the town, and was not a member of Mrs. Swartz's household.

In speaking to another witness she said:

"I am going to make a will. No one don't know when they have got to die. One or two of my old girls that stood by me and were faithful to me while at the Francis, I have got to remember. Of course, I have got my brother, and poor little Shorty (meaning Shorty Phillips), I never could forget him."

From reading all of the evidence, it appears that she made the disposition of her property along lines frequently indicated by her a considerable time before her death.

Our conclusion is that, from the entire record, the contestant wholly fails to make any showing that would justify the court in denying the will to probate. The judgment of the trial court is, therefore, reversed and the cause remanded, with directions to admit the will to probate.

RAINEY, C. J., HARRISON, V. C. J., and JOHNSON and McNEILL, JJ., concur.