## LA MOORE v. UNITED STATES.

### No. 11893.

United States Court of Appeals
Ninth Circuit.

Jan. 13, 1950.

Joseph A. McLean, Juneau, Alaska, for appellant.

P. J. Gilmore, Jr., U. S. Atty., Stanley D. Baskin, Asst. U. S. Atty., Juneau, Alaska, for appellee.

Before MATHEWS, HEALY and POPE, Circuit Judges.

MATHEWS, Circuit Judge.

Appellant, Eugene LaMoore, Alias Austin Rollan, was indicted under § 4757 of the Compiled Laws of Alaska, 1933,[1] now § 65-4-1 of Alaska Compiled Laws Annotated, 1949. The indictment charged that on or about December 22, 1946, in Division No. 1, Territory of Alaska, appellant, "being of sound memory and discretion, purposely, while engaged in robbing Jim Ellen, murdered the said Jim Ellen by cutting him." Thus appellant was charged with the crime of murder in the first degree. Appellant was arraigned, pleaded not guilty, was tried

1. Section 4757 provided: "Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, any rape, arson, robbery or burglary, kills another, is guilty of murder in the first degree, and shall suffer death."

and found guilty as charged in the indictment, was sentenced to death and has appealed.

At the trial, twelve witnesses testified, and six exhibits were admitted in evidence. The evidence showed that in the late evening of December 21 or the early morning of December 22, 1946, at Jim Ellen's place of business, a grocery and liquor store in Juneau, Alaska,[2] appellant and Austin Nelson robbed Jim Ellen and, in perpetrating the robbery, purposely killed him by cutting his throat and thus causing him to bleed to death.

Appellant was arrested and placed in the Federal jail at Juneau on April 19, 1947. On July 1, 1947, while in jail, he made and signed a self-incriminating statement. The statement was made to H. L. Faulkner, an attorney at law, and Walter G. Hellan, a United States deputy marshal. It was dictated by appellant to Faulkner in the presence and hearing of Hellan, was typed by Faulkner as dictated by appellant, was read by Faulkner to appellant in the presence and hearing of Hellan and was then read and signed by appellant in the presence of Faulkner and Hellan.

At the trial—in February, 1948—the statement was offered in evidence by appellee, the United States. Appellant objected to its admission. The objection was overruled, and the statement was admitted in evidence as Exhibit No. 4.[3] At the close

2. Juneau is in District No. 1.

3. The statement (Exhibit No. 4) reads as follows:

"Statement of Eugene LaMoore.

"I, Eugene LaMoore of my own free will and accord, and without having any promises of any nature made to me in the presence of H. L. Faulkner, attorney at law of Juneau to whom I have stated that I have already talked to Walter Hellan, Deputy U. S. Marshal, make the following statement to Walter Hellan, Deputy U. S. Marshal:

"My name is Eugene LaMoore. I am 44 years of age. I have lived in Juneau Alaska since 1942. I am married to Elizabeth Kunz.

"I have known Austin Nelson for about four years. On Saturday night about midnight, December 21st, 1946 I talked to Austin Nelson at Blackie's Bar on South Franklin Street, Juneau and he suggested that we go to Jim Ellen's store on Willoughby Avenue and rob Ellen. He had suggested that several times before. Nelson at that time had a revolver belonging to me.

"I pleaded with Nelson not to kill Ellen. This was on the way to the store. When we arrived at the store I put on a mask, but Austin did not put on any mask. Nelson tapped on the window and Ellen came to the front door of the liquor store and opened it. We entered the liquor store. This liquor store is built inside of the grocery store. It was about 12:45 o'clock when we entered the store. We first had stopped at Frank Pineda's place before we arrived at Ellen's store.

"Ellen went to the back of the store and Nelson followed him and Nelson said 'this is a stickup.' Nelson then pushed the gun against Ellen and I pushed him into the grocery store. He had my gun. Then I heard a scuffle and I thought Nelson had just knocked Ellen out by hitting him over the head with the gun. The gun was not loaded; but we had decided to knock Ellen out with the gun if he offered resistance. I knew we went there to rob Ellen.

"Then when the scuffle was over Nelson came back into the liquor store where I was and opened the cash register and took out the money. I did not know how much money he got until later on. When Ellen walked to the back of the store after we entered I switched off the lights and it had been agreed between Nelson and myself that I would remain in the liquor store as a lookout while Nelson did the robbery.

"After taking the money from the cash register, Nelson went back to the rear of the store, perhaps to the kitchen, but I could not see. Then I heard water running as from a tap. Then Nelson came back to the liquor store and said 'let us go out the back door.' Then he went out the back door and I went out the front door after Nelson had come around in front of the store so I could see him.

"We then went up over the steps by the Seaview Apartments and walked to the Alaskan Hotel. We went upstairs and entered the men's toilet on the first floor up. Nelson then took out from his pocket a roll of bills and divided them and put half back into his pocket and put my share on the floor. When I stooped to pick up the money I noticed blood on my coat and found that this had come from Nelson's clothes when I brushed past him to pick up the money. I said, when I noticed the blood 'Good God man, what

of all the evidence, appellant moved to strike the statement. The motion was denied. Appellant here contends that the statement was inadmissible, thus, in effect, contending that the trial court erred in overruling the objection and in denying the motion.

The ground of the objection was that it had "not been shown satisfactorily that [the statement] was made freely and voluntarily, without any promise or any threats towards [appellant]." The ground of the motion was that the statement was involuntary.

Before the statement was admitted in evidence, Hellan was called as a witness for appellee and testified as follows:

"Q. Now, Mr. Hellan, did this defendant, Eugene LaMoore, ever make a statement to you admitting he was down there and participated in the robbery at Jim Ellen's on the night of December 21 or early morning of December 22, 1946? A. Yes, he did. * * *

"Q. Mr. Hellan, were the statements he made in regard to what he was talking to you about, reduced to writing? A. Finally.

"Q. Was everything he said, in connection with what he said that was reduced to writing, of a free and voluntary nature on his part? A. Yes, it was.

"Q. Was there any coercion, force or duress of any kind or description, to your knowledge, used in obtaining the statement? A. None at all.

"Q. Will you tell the court and jury when and where the statements that you

---

happened. What did you do?' Nelson said 'I had to do it, I had to do it.' There was considerable blood on Nelson at the time and I also got some on my hat when I stooped over to pick up the money. My share of the money was a little less than a thousand dollars. It was all in currency.

"Nelson and I then walked down Lower Franklin Street as far as Blackie's Bar. I entered the bar as my wife was there but Nelson continued on past Blackie's down the street. My wife and I then went to the Glacier Cab stand and took a cab home. This was about 1:05 A.M. Dec. 22, 1946. When we went home then I had the gun which Nelson had returned to me after the robbery and I gave it to my wife and I then hid my share of the money in the woodshed. Then my wife and I walked down town again. It was 2:20 A.M. Dec. 22nd when we passed Jim Ellen's place. We looked through the window at the clock. We then went to room 30 at the Ismael Hotel and we remained in the Ismael Hotel until shortly before 3 A.M. From the Ismael Hotel my wife and I went to the City Cafe and had some lunch. Then we walked up as far as the Alaskan Hotel. On the way up the street we were on the seaward side of the street and about at the Glacier Cab stand we saw Nelson going up the street in the same direction but he was on the opposite side of the street from us. He came across the street and walked with us as far as the Alaskan Hotel. We, my wife and I took a cab from the Alaskan Hotel at 3.40 A.M. for home. I did not see Nelson again until

I saw him in the Commissioner's Court after he had been arrested.

"When I got up from bed on Sunday morning Dec. 22nd I washed my coat to try to get the spots of blood off it. I then burned my hat and rubbers, although there was no blood on my rubbers. After Nelson's arrest Deputy Marshals Hellan and Thompson came to my house and talked to me and examined my shoe packs which I had on then and looked over all the clothes I had on. That night I threw my overcoat into Gold Creek.

"I did not kill Jim Ellen. I never touched him and I did not see Nelson kill him. I spent part of my share of the money Nelson and I divided that night but the greater part of it was stolen from the woodshed where I had hidden it.

"When we went to Jim Ellen's store on the night of Dec. 21st or early morning of December 22, 1946 I had no intention of killing him and our intention was to rob him and to knock him out if necessary, but nothing more. That I had taken the cartridges out of the gun, and I did not know that he would be killed. I did not know that Nelson had a knife or razor and if I had known I would not have gone with Nelson at all.

"Dated at Juneau, Alaska, July 1st, 1947.

"The foregoing statement was dictated by me and after it was typewritten I read it and also had it read to me and I fully understand it.

"Eugene LaMoore.

"Witness:

"Walter G. Hellan,

"H. L. Faulkner."

have been talking about took place—when and where, Mr. Hellan? A. It was about eight o'clock in the evening of July 1, 1947. Mr. Faulkner was present by request of the defendant.

"Q. What were the circumstances leading up to Mr. Faulkner's being present? * * * A. I asked Eugene LaMoore if he would be willing to make a statement and sign it to me, and he said he would.

"Q. A statement along the lines—A. Of the story that he had told me. * * * He requested that I ask Mr. Faulkner to come there and be present when he made the statement. I agreed and told him I would contact Mr. Faulkner. I saw Mr. Faulkner the same day and asked him if he would come up there at that time. * * * I told Mr. Faulkner the story that Eugene LaMoore had told me, and he agreed to go to the jail with me, which he did, and we went up there the same day in the evening between seven and eight o'clock. When we reached the jail, Mr. Faulkner and Eugene LaMoore talked together for a while, then called me in, and Eugene LaMoore said he was ready to make the statement. * * * I told Eugene LaMoore that it was not compulsory to make a statement, that he did not have to make a statement unless he wanted to. Eugene LaMoore said he understood all that and wanted to make a statement anyway. * * *

"Q. Now, just one or two more questions preparatory to this statement. Were there any promises or threats or offers of reward made to him in connection with making this statement, by you or by anyone, to your knowledge? A. None whatever.

"Q. You are certain of that? A. I am certain.

"Q. I believe you testified already that it was a free and voluntary statement on his behalf? A. That is right. I then brought in a typewriter for Mr. Faulkner to use in taking down the statement.

"Q. Who typed the statement? A. Mr. Faulkner. And LaMoore told his story very slowly and even waited at times for Mr. Faulkner to catch up with him, so that

he wrote it down word for word. * * * As Mr. Faulkner wrote it down, he read each paragraph to LaMoore aloud. * * * Before continuing with the subsequent paragraph, he read each paragraph to him, and at the end of the statement he read the whole statement to him and then passed the statement over to LaMoore to read, which he appeared to do. I told LaMoore, if he found any mistakes in the statement or wanted to add anything to it, that the corrections would be made. LaMoore read the statement and, when he got through reading it, he signed it."

After the statement was admitted in evidence, Faulkner was called as a witness for appellee and testified as follows:

"Q. What is your business, profession or occupation? A. Attorney at law.

"Q. And you are a licensed and practicing attorney in the Territory of Alaska, are you not? A. Yes, sir.

"Q. For how many years have you practiced in Juneau? A. Thirty-three years.

"Q. Mr. Faulkner, calling your attention to the day of July 1, 1947, do you remember that day? A. I do.

"Q. Did you have occasion to see this defendant, Eugene LaMoore, on that day, July 1, 1947? A. I did. * * * Mr. Hellan, the deputy marshal, came to the office and asked me to go up to the jail to see LaMoore, who wanted to see me.

"Q. Do you remember about what time of day that was? A. In the forenoon, I think, of July 1, and I went to the jail with him that evening about eight o'clock and saw him. * * *

"Q. Did you see this defendant, LaMoore, when you got to the jail? A. Yes. * * *

"Q. Did you have a conversation in which only you and he were present? A. I did. * * * When I went to the jail, LaMoore was brought into a room there off the guard's room. I went in there and told him that I understood he sent for me, and he said, 'Yes.' I said 'What did you want?'

"Q. Did you represent him professionally? Were you his attorney, lawyer or

anything like that? A. No. I said, 'I want to make it clear to you, I can't represent you, and I am not here representing you. What do you want from me?' He said, 'I want to see you.' I said, 'What for?' He said, 'I told a story to Mr. Hellan.' I said, 'What was the story you told Mr. Hellan?' He told me the same story Mr. Hellan had related to me in the forenoon of that day. * * * Following his story to me, which corroborated the story Mr. Hellan had told me, I asked him if he wanted to put that in writing. * * * He said, 'Yes, I would like to put it in writing.' I said, 'Do you want me to write it out for you?' He said, 'Yes.' I called Mr. Hellan in with a typewriter. I told LaMoore again, in Mr. Hellan's presence, that I came there at his request and was not representing him, but that I came solely because he sent for me, and I took the typewriter, and he dictated.

"Q. Who was present? A. Mr. Hellan and the defendant. I made it into paragraphs and read each paragraph separately as I wrote it, and then the statement was read in full, and I passed it to him. He read it and signed it.

"Q. Was that a free and voluntary statement by this defendant? A. Yes.

"Q. Was there any force or coercion used on him? A. None in my presence.

"Q. Physical force? A. No.

"Q. Mental force? A. No.

"Q. Or statements? Was anything said to induce him to make a statement? A. No.

"Q. Or any offers or promises of reward if he made the statement? A. No."

After appellee rested its case, appellant testified as a witness for himself. He testified that the statement was not voluntary, but he also testified that he made the statemen in order to help Nelson [4] and because Faulkner advised him to make it,[5] which, if true, showed that it was voluntary.

Appellant testified that he was in fear when he made the statement, but he did not say why he was in fear or what he was in fear of, nor did he testify that fear caused him to make the statement. The mere fact that he was in fear did not render the statement involuntary.[6]

Appellant testified that on several occasions prior to the making of the statement, John R. Hayes,[7] an agent of the Federal Bureau of Investigation, came to the jail and asked him to make a statement; that he refused to, and never did, make a statement to Hayes; that on one occasion—in June, 1947—Hayes was accompanied by Robert Boochever, Assistant United States Attorney for Alaska; that on that occasion appellant and Hayes almost had a fight; that, but for Boochever, Hayes would have beaten appellant up; that Hayes threatened to hit appellant;[8] that Boochever stopped Hayes;[9] that on another occasion Hayes and Faulkner visited appellant at the jail; that on that occasion appellant and Hayes almost came to blows;[10] and that Faulkner "stepped in," meaning, apparently, that Faulkner intervened and prevented appel-

---

4. Appellant and Nelson were separately indicted and separately tried for the murder of Jim Ellen. Nelson was tried, convicted and sentenced to death prior to July 1, 1947, but was not executed until March 1, 1948—after appellant was convicted and sentenced. Appellant appears to have believed that, by making the statement, he could prevent or delay Nelson's execution.

5. Faulkner testified that he gave appellant no such advice.

6. Symons v. United States, 9 Cir., 1949, 178 F.2d 615.

7. Sometimes called Jack Hayes.

8. Appellant's testimony—assuming it to be true—showed that Hayes was provoked, not by appellant's refusal to make a statement, but by offensive and insulting remarks made to Hayes by appellant.

9. Hayes and Boochever testified as witnesses for appellant. Both testified that they visited appellant at the jail in June, 1947, but neither of them testified that appellant and Hayes almost had a fight, or that Hayes attempted or threatened to beat or hit appellant.

10. Appellant's testimony—assuming it to be true—showed that this, too, was caused by offensive and insulting remarks made to Hayes by appellant.

lant and Hayes from coming to blows.[11] However, there was no evidence that anything done or said by Hayes caused appellant to make the statement (Exhibit No. 4). Hayes was not present when the statement was made and, so far as the evidence showed, had nothing to do with it.

As indicated above, appellant was in jail when he made the statement. He wore leg irons while in jail and was wearing them when he made the statement. However, there was no evidence that being in jail or wearing leg irons caused him to make the statement. The mere fact that he was in jail and wore leg irons did not render the statement involuntary.[12]

Appellant, while in jail, occupied a cell by himself. In other words, he had no cellmate. Therefore, in his brief, he describes his confinement in jail as "solitary" confinement. The description is inaccurate, for appellant was not in his cell continuously, nor was he alone continuously. He had frequent visitors. Some of these visits occurred in his cell, and some of them occurred in another room of the jail—a room which he called an attorney room and Hellan called a visiting room. There was no evidence that having no cellmate caused appellant to make the statement.

There was no substantial evidence that the statement was induced by, or made as a result of, force, fear, threats, promises, offers of reward or any other improper influence. The trial court therefore concluded—and, we think correctly concluded —that the statement was voluntary.

In determining whether a confession or a self-incriminating statement is

voluntary or involuntary, a trial court "is necessarily vested with a very large discretion, which will not be disturbed on appeal, unless a clear abuse thereof is shown." [13] In this case, there is no such showing.

Appellant testified that Faulkner was employed as his attorney, and that the statement was made and dictated to Faulkner in the course of such employment. Appellant therefore contends that the statement was confidential and inadmissible in evidence, thus, in effect, contending that it was a privileged communication—a contention based on § 4310 of the Compiled Laws of Alaska, 1933,[14] now § 58-6-4 of Alaska Compiled Laws Annotated, 1949. We reject this contention for the following reasons:

First. As indicated above, Faulkner testified that he was not employed as appellant's attorney and was not appellant's attorney. In view of Faulkner's testimony, the trial court was not, nor are we, required to hold that the statement was privileged.[15]

Second. As indicated above, the statement was made, not to Faulkner alone, but to Faulkner and Hellan. There was no confidential relationship between appellant and Hellan. Hence the statement was not privileged.[16]

Third. Although, as indicated above, appellant objected to the admission of the statement in evidence, he did not object on the ground that it was privileged. By failing to object on that ground, appellant waived the privilege,[17] if any existed.

We conclude that the trial court did not err in overruling appellant's objection to the admission of the statement in evidence

11. This testimony was contradicted by Hayes and Faulkner. Hayes testified that he was never at the jail with Faulkner. Faulkner testified that he was never at the jail with Hayes.

12. Sparf v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343.

13. Mangum v. United States, 9 Cir., 289 F. 213.

14. Section 4310 provided: "An attorney shall not, without the consent of his client, be examined as to any communica-

tion made by his client to him, or his advice given thereon, in the course of his professional employment."

15. Bolling v. United States, 5 Cir., 76 F.2d 390.

16. York v. United States, 8 Cir., 224 F. 88; Livezey v. United States, 5 Cir., 279 F. 496; Tutson v. Holland, 60 App.D.C. 188, 50 F.2d 338.

17. Steen v. First National Bank, 8 Cir., 298 F. 36.

or in denying his motion to strike it. No other error is specified. However, we have carefully examined the entire record and have found no prejudicial error.

Judgment affirmed.