Ronald L. PLATE, Appellant,

v.

STATE of Alaska, Appellee.

STATE of Alaska, Appellant,

v.

Ronald L. PLATE, Appellee.

Nos. A–5375, A–5565, A–5575.

Court of Appeals of Alaska.

Oct. 17, 1996.

Order Denying Rehearing Nov. 8, 1996.

James H. McComas, Anchorage, for Ronald L. Plate.

William H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for State of Alaska.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Ronald L. Plate was convicted of several counts of first- and second-degree sexual abuse of a minor (AS 11.41.434; AS 11.41.436) in case number 3KN–93–289 Cr. After he was convicted, Plate filed a petition for post-conviction relief (case number 3KN–94–881 Civ). The superior court granted Plate's petition and set aside his convictions. Plate appeals his convictions, and the State appeals the superior court's decision to grant post-conviction relief. We affirm the superior court's decision granting post-conviction relief to Plate.

Plate was indicted on six counts of sexually abusing his stepdaughter S.P. during the years 1987 through 1990. S.P. testified that Plate began touching her "in places he wasn't supposed to" when she was four or five years old. As she grew older, Plate would touch her breasts and force her to touch his penis. When she was nine years old, Plate made her sleep in his room without wearing any clothes; during this time he touched her breasts and vagina and made her rub his penis with her hand.

S.P. testified that, starting in March of 1987, Plate made her take off her clothes and perform fellatio on him. On other occasions, he would touch her breasts and vagina.

Starting in the summer of 1990, Plate forced S.P. to have genital and anal intercourse with him. During these incidents, Plate sometimes tied S.P.'s hands and feet.

S.P. told her counselor at a Bible camp about the sexual abuse. She later moved out of Plate's house and began living with one of her sisters. Finally, in November 1992, S.P. told a teacher about the sexual abuse, and the teacher contacted the police.

S.P.'s two older sisters, C.H. and K.A., testified that Plate had sexually abused them on several occasions when they were younger.[1]

Plate took the stand and denied that he had sexually abused any of his three stepdaughters in any manner.

Jury deliberations began on Friday afternoon, April 1, 1994. Over the weekend, one of the jurors was killed in an explosion. When court reconvened on Monday, April 4th, Superior Court Judge Charles K. Cranston recalled one of the previously discharged alternate jurors and, over Plate's objection, seated this alternate as a replacement for the juror who had been killed. Two days later, the jury found Plate guilty on five of the six counts of sexual abuse.

Plate sought post-conviction relief, contending (among other things) that Judge Cranston had committed reversible error by replacing the deceased juror with the previously discharged alternate. Superior Court Judge Jonathan H. Link agreed with Plate; he vacated all of Plate's convictions. The State now appeals Judge Link's decision.

*The Trial Judge's Decision to Recall an Alternate Juror When One of the Regular Jurors Died During Deliberations*

■ Alaska Criminal Rule 24(b)(2)(A) authorizes a trial judge to impanel up to four alternate jurors. Under the rule, these alternate jurors

shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties. An alternate juror who does not replace a regular juror shall be dis-

---

1. The State did not prosecute Plate for these acts    because the statute of limitations had run.

charged after the jury retires to consider its verdict.

The wording of this rule strongly suggests that, once the jury begins its deliberations, alternate jurors must be discharged from further service and the trial judge no longer has the authority to recall an alternate to replace a regular juror. Cases from other jurisdictions support this interpretation of Rule 24(b)(2).

In *People v. Burnette*, 775 P.2d 583 (Colo. 1989), the Colorado Supreme Court faced an almost identical issue. At trial, just as the regular jurors were to commence their deliberations, the trial judge discharged the alternate juror. The trial judge nevertheless admonished the alternate:

> I will tell you, however, that you are not to discuss your view of the case, and what your vote on the verdict might be, with anyone until the jury has, in fact, reached a verdict, because it may still be necessary to call upon you. But you are excused....

*Burnette*, 775 P.2d at 585.

The regular jurors began their deliberations; they deliberated for approximately four and a half hours, then they were excused for the evening. That night, a severe snow storm struck the county where the trial was being held. Early the next morning, one of the jurors notified the court that he was unable to reach the courthouse. *Id.*

When Burnette's attorney refused to stipulate to a jury of less than twelve, the trial judge decided to recall the alternate juror (over Burnette's objection). The judge brought the eleven remaining regular jurors and the alternate into the courtroom and advised them that the alternate would be substituted for the snow-bound juror. *Id.* The judge instructed the eleven regular jurors that they were to start deliberations over again so that the alternate juror "has the benefit of whatever might have been discussed yesterday [and] has the opportunity to contribute to things." *Burnette*, 775 P.2d at 585. The newly constituted jury deliberated for a half-hour that day, then

returned the next and deliberated for some time before finding the defendant guilty.

The Colorado Supreme Court held that the trial judge had violated Colorado's Criminal Rule 24 by seating the alternate juror after deliberations had begun. *Burnette*, 775 P.2d at 586. Colorado's Rule 24, like Alaska's, declared that it was the function of alternate jurors to "replace jurors who, *prior to the time the jury retires to consider its verdict*, become unable or disqualified to perform their duties". (Emphasis added) The Colorado court held that the "clear implication" of this language was "that an alternate juror is available to replace a juror ... only prior to the time the jury retires." *Id.* The court held that a trial judge had no authority to keep alternate jurors "on call" to substitute for regular jurors after the jury had begun its deliberations.[2]

The federal courts have reached the same conclusion when interpreting Federal Rule of Criminal Procedure 24(c), which contains language essentially identical to Alaska's rule and the Colorado rule. The legislative history of Federal Criminal Rule 24(c) indicates that the Federal Rules Committee considered the possibility of allowing alternate jurors to be substituted for regular jurors even after deliberations had begun, but the Committee later rejected this idea after the United States Supreme Court inquired of the Committee whether it had satisfied itself that such a procedure would be desirable and constitutional. *See* ABA Standards for Criminal Justice, Standard 15–2.7, at pp. 15–75 (citing L. Orfield, *Trial Jurors in Federal Criminal Cases*, 29 F.R.D. 43, 46 (1962)).

The federal courts that have faced this issue have uniformly ruled that Federal Rule 24(c) does not authorize mid-deliberation substitution of an alternate juror for a regular juror. *See, e.g. United States v. Guevara*, 823 F.2d 446 (11th Cir.1987); *United States v. Josefik*, 753 F.2d 585 (7th Cir.1985), *cert. denied* in *Soteras v. United States*, 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985); *United States v. Hillard*, 701 F.2d 1052 (2d Cir.1983), *cert. denied*, 461 U.S. 958, 103

---

**2.** Following the decision in *Burnette*, Colorado amended its Criminal Rule 24 by deleting the language "prior to the time the jury retires to

consider its verdict". *See* Colorado Rules of Court (1995 edition), Criminal Rule 24.

S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Kaminski*, 692 F.2d 505 (8th Cir. 1982); *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *U.S. v. Rubio*, 727 F.2d 786, 799 n. 7 (9th Cir.1983).[3]

Having reviewed these authorities, we hold that Alaska Criminal Rule 24(b)(2) does not authorize a trial judge to substitute an alternate juror for a regular juror once deliberations have begun.

■ The State suggests that Judge Cranston's action can be justified under Criminal Rule 53, which authorizes relaxation of any criminal rule when "it [is] manifest . . . that a strict adherence to [the rule] will work injustice". Judge Cranston did not rely on Rule 53 when he recalled the alternate juror to serve on Plate's jury. Moreover, adhering to Rule 24(b)(2) does not work manifest injustice in this case.

One of the primary benefits of having juries decide lawsuits is that the decision is made by a group of people who bring differing personalities, backgrounds, and attitudes to their deliberations. Because the jurors must deliberate and reach their decision as a group, the jurors' decision necessarily reflects an amalgam of their individual insights and analyses. We must presume that the deliberations of an unchanging group of twelve are not equivalent to the deliberations of a group of eleven who are later joined, in the middle of their deliberations, by a twelfth person.

In Plate's case, the regular jurors had deliberated for four and a half hours on Friday before they were excused for the weekend. Thus, it is reasonable to assume that the jurors had already begun to formulate and exchange opinions about the case before they recessed their deliberations. The alternate juror, as well, can be presumed to have given some thought to the case over the weekend. Judge Cranston instructed him not to discuss the case with anyone until the verdicts were announced, but the judge did not instruct him to refrain from forming conclusions about the case.

When Judge Cranston recalled the alternate juror on Monday, he asked the alternate if he had followed the admonition not to discuss the case with anyone else. The alternate assured Judge Cranston that he had followed the judge's order. However, Judge Cranston did not ask the alternate whether he had formed any opinions about the case since being discharged on Friday.

Likewise, when Judge Cranston addressed the remaining regular jurors, he inquired only cursorily whether any of them would "have a problem" with beginning deliberations anew with the alternate juror. Judge Cranston did not press the jurors to see whether substantive discussions of the evidence had taken place during the four and a half hours of deliberation on Friday, nor did the judge ask whether individual jurors Cranston did not seek the jurors' assurances that they would be able to disregard their previous deliberations.

These factors led the Colorado Supreme Court in *Burnette* to conclude that the violation of Colorado Criminal Rule 24 required reversal of the defendant's conviction. 775 P.2d at 590. We similarly conclude that, under the facts of Plate's case, it would have been an abuse of discretion for Judge Cranston to rely on Criminal Rule 53 to deviate from the commands of Criminal Rule 24(b)(2). The values protected by Rule 24(b)(2) were not satisfied by the procedures employed in Plate's case.

We do not mean to say that any violation of Rule 24(b)(2) would necessarily result in a deprivation of due process or infringement of the defendant's constitutional right to a jury trial. As noted in footnote 2, the State of Colorado has amended its version of the rule

---

**3.** The majority of these courts found the error to be harmless when the trial court utilized safeguards to neutralize the possible prejudice to the defendant. However, as our later discussion makes plain, we do not find the error to be harmless in Plate's case.

Some federal courts have also held that that a defendant may waive Federal Rule 24(c)'s restriction on the use of alternate jurors. *See, e.g., Leser v. United States*, 358 F.2d 313, 317–18 (9th Cir.1966), *cert. dismissed*, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966). Plate did not waive his rights under Alaska Criminal Rule 24(b)(2).

to allow substitution of an alternate juror even after the jury retires. Presumably, Colorado believes that this procedure is constitutional. But, whether such a procedure is constitutional or not, Alaska law does not allow it.

We also acknowledge that, under particular circumstances, a deviation from the mandate of Rule 24(b)(2) might be harmless (or might be justified under Rule 53). However, as explained above, Plate's case involves a substantial violation of Rule 24(b)(2).

We thus affirm the superior court's judgement in the post-conviction relief action. Plate is entitled to a new trial on the five charges of which he was convicted.

█ The State argues that if Plate's convictions are to be vacated, then Plate's acquittal of the sixth charge should likewise be vacated. According to the State, "if Plate's jury was not a 'real' jury for purposes of the counts on which [he] was convicted, it could not have been a 'real' jury for purposes of the count on which [he] was acquitted." While the State's position has a certain logic, setting aside the acquittal would violate the constitutional protection against double jeopardy. *Benton v. Maryland,* 395 U.S. 784, 796–97, 89 S.Ct. 2056, 2063–64, 23 L.Ed.2d 707, 717 (1969); *DeSacia v. State,* 469 P.2d 369, 378–79 (Alaska 1970). Plate's acquittal on Count Five of the indictment must stand.

We now address two evidentiary issues that are likely to arise again on retrial. The first issue involves Plate's attempt to have a psychologist testify concerning matters affecting S.P.'s credibility. The second issue involves the State's attempt to introduce evidence of admissions that Plate made to his pastor concerning Plate's sexual abuse of K.V.A., S.P.'s older sister.

### *Plate's Attempt to Introduce Psychological Testimony on the Issue of S.P.'s Credibility*

Before trial, Plate asked the superior court to order S.P. to undergo examination by Paul E. Turner, a psychologist. Plate argued that S.P.'s allegations were "completely uncorroborated", and he claimed that an examination was necessary to develop evidence that S.P.

was neither a credible nor even a competent witness. In a supporting affidavit, Dr. Turner declared that a child raised in a "blended" family (that is, a family in which the children do not all have the same biological parents) can develop "parent alienation syndrome", a condition in which the child aligns emotionally against the stepparent. Dr. Turner claimed that, through psychological examination, it could be determined whether a child demonstrated "certain [behavioral] hallmarks ... indicative of sexual abuse"; Dr. Turner also claimed that such an examination could "identify any emotional conditions which might prompt fabrication".

Judge Cranston granted Plate's motion. Dr. Turner subsequently examined S.P. and concluded that S.P. did not exhibit behavior indicative of sexual abuse. In his report, Dr. Turner stated:

> It is this examiner's opinion that the totality of the allegations made by [S.P.] are of doubtful veracity. There is a lack of internal and external consistency [in] [S.P.'s] allegations. These allegations have changed and continue to change.... The differences in her descriptions in terms are characterized by a lack of detail, poor detail, vague detail, and detail that is quite vague, changeable, and variable.... It is this examiner's opinion that she has difficulty providing specific details[,] not because of trauma of post-traumatic stress disorder[,] but because of other possible psychological issues such as hysterical personality traits or the extreme alienation she experiences in her relationship with her stepfather.

> .  .  .  .  .

> In sum, this examiner feels that these allegations are of doubtful veracity. It is very difficult to discern from a psychological perspective that this young lady was sexually abused.

Following its receipt of this report, the State moved to preclude Dr. Turner from testifying. The State argued that Turner's testimony was inadmissible because it was character evidence. *See* Alaska Evidence Rules 403, 404, 702, and 703. Judge Cranston partially granted the State's motion to

preclude Turner's testimony. Judge Cranston ruled that Dr. Turner could testify about

> [the] answers S.P. provided in [the] clinical interview[,] including [in]consistent statements regarding the details of the abuse including, but not limited to, her admission that "she had not told the truth" regarding the abuse, and her contradictory statements regarding the reports of abuse ... so long as [this testimony is] admissible under ... the hearsay rule.

Judge Cranston further ruled that, if the State presented expert testimony to bolster S.P.'s credibility, then Plate would be permitted to call Dr. Turner as a rebuttal witness concerning the results of psychological tests, the established criteria for evaluating claims of sexual abuse, and the special psychological dynamics of "blended" families.

On appeal, Plate argues that Judge Cranston was wrong to exclude Dr. Turner's testimony. Plate relies on cases such as *Pickens v. State,* 675 P.2d 665, 668–670 (Alaska App. 1984), in which this court ruled that a trial judge should not order a witness to submit to psychological evaluation unless the defendant first makes a showing (1) that the witness's testimony is "uncorroborated or otherwise [apparently] untrustworthy", (2) that there is "good cause to believe ... that [the witness's] ability to perceive events accurately or to relate those events truthfully [is] substantially impaired"; and (3) that "this impairment [is] of a such nature that a psychological evaluation would be likely to confirm its existence or provide material information as to its scope". *Id.* at 669.

The State contends that Dr. Turner's proposed testimony was the same type of "profile" evidence that this court found inadmissible in such cases as *Cox v. State,* 805 P.2d 374, 377–79 (Alaska App.1991), *Nelson v. State,* 782 P.2d 290, 297–99 (Alaska App. 1989), and *Haakanson v. State,* 760 P.2d 1030, 1036 (Alaska App.1988). These cases dealt with the State's attempts to introduce evidence that a purported victim of sexual abuse fit the "profile" of behaviors manifested by sexual abuse victims, and that therefore the child's behavior after the alleged

incident demonstrated that the child had indeed been sexually abused.

This court has repeatedly confronted the issue of whether juries should hear psychological analysis of defendants' and victims' behavior. The most recent discussion of this issue is found in *Shepard v. State,* 847 P.2d 75, 80–81 (Alaska App.1993). In *Shepard,* this court said:

> We have recognized a special danger when an expert is allowed to apply a novel psychological profile to identify a person as a member of a certain group or class in order to prove that the person [has] testified truthfully or acted unlawfully. ´ Because the expert in effect assumes the role of human polygraph in such cases, we have ... requir[ed] the proponent of [such] evidence to demonstrate that the psychological profile involved in the case has been generally accepted as valid and that the expert's testimony concerning the profile has particularized relevance to issues actually in dispute. We have never authorized expert testimony seeking to establish that a person is a member of a particular class or group, *i.e.,* battered women or sexually abused children, by showing that [the person] exhibit[s] behavioral characteristics common to that group.

*Shepard,* 847 P.2d at 80 (citations and internal quotations omitted). *But see Broderick v. King's Way Assembly of God,* 808 P.2d 1211, 1216–17 (Alaska 1991). On the other hand, this court has

> never expressed similar reservations about psychological evidence whose purpose is merely to establish that certain testimony is not necessarily untruthful or that certain conduct is not necessarily indicative of guilt[.] [The] more modest aim of [such] psychological testimony ... is to assist the jury in reaching its own interpretation of the evidence[.]

*Shepard,* 847 P.2d at 81.

Judged against this standard, Plate's broad offer of proof in this case is problematic. It appears that some of Dr. Turner's proposed testimony was inadmissible. For instance, Turner asserted that S.P. should not be believed because she had given differing or vague accounts of the abuse. This

proposed testimony appears to be the converse of the testimony that was held to be error in *Cox v. State,* 805 P.2d at 378–79. (In *Cox,* Dr. Turner testified for the State; he asserted that a child who claimed to have been sexually abused should be believed because she had given a detailed account of the abuse.)

On the other hand, other portions of Dr. Turner's proposed testimony are potentially admissible. For example, Dr. Turner offered to explain the dynamics of "blended" families and the reasons a stepchild might harbor animosity toward a stepparent. Assuming that Dr. Turner has the required expertise to testify on these subjects, this testimony appears to be relevant.

If Plate is retried and again offers Dr. Turner's testimony, Plate should clearly specify the subjects on which he proposes to have Dr. Turner testify. To the extent that it is not clear whether a psychologist would have the expertise to offer an opinion on these subjects, Plate should further specify how the particular offered testimony falls within Dr. Turner's expertise. In addition, Plate should be prepared to address whether the psychologist's conclusions about S.P. are based on scientific analysis that satisfies the *Frye* test. *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923); *Contreras v. State,* 718 P.2d 129, 136 (Alaska 1986); *Shepard v. State,* 847 P.2d at 80–81.

We now turn to the second evidentiary issue.

*Does Alaska Evidence Rule 506 Prohibit the State from Introducing Testimony Concerning Plate's Conversation with a Pastor from his Church?*

In 1987, S.P.'s sister K.V.A. reported to a school administrator that Plate had sexually abused her. Tom Johnson, the Plate family's church pastor, accompanied the school administrator to speak to Plate about this allegation. At first, Plate denied the abuse. In response, the two men told Plate that they wanted to help him and his family, but if Plate was not willing to accept their help, then they would report K.V.A.'s allegations to the police.

Later that same evening, Plate telephoned Johnson and acknowledged that he had abused K.V.A. According to Johnson, Plate "agreed to get together with me and work out whatever needed to be worked out". Plate and Johnson had several subsequent meetings. At one of these meetings, Johnson asked Plate to tell him what had occurred between him and K.V.A. Plate corroborated K.V.A.'s account of the sexual abuse: he admitted to Johnson that he had pinned K.V.A. to the floor, then had raised her shirt and fondled her breasts.

As noted above, Plate took the stand at his trial and denied that he had ever sexually abused or improperly touched any of his three stepdaughters. In response, the State called Johnson as a rebuttal witness. Plate objected, arguing (among other things) that his communications with Johnson were privileged under Alaska Evidence Rule 506, which deals with communications to a member of the clergy. Under Evidence Rule 506(b),

[a] person has a privilege to ... prevent another from disclosing a confidential communication by the person to a member of the clergy in that individual's professional character as spiritual advisor.

Judge Cranston held a hearing on whether Plate's statements to Johnson were covered by Rule 506.

At this hearing (out of the presence of the jury), Johnson testified that he had not promised confidentiality to Plate during their meetings, and that he did not consider those meetings to be counseling sessions. In fact, Johnson testified that he never provided counseling to Plate. After hearing Johnson's voir dire testimony, Judge Cranston ruled that Plate's communications with Johnson were not privileged. The judge therefore ruled that the State would be allowed to present Johnson as a witness.

Immediately following this ruling, Plate sought reconsideration. Taking the stand, Plate testified that he had believed that his conversations with Johnson were confidential. Plate testified that he met with Johnson in Johnson's office with the door closed. Plate further testified that Johnson indicated to him that nothing Plate said would be repeated to other members of the church.

Responding to Plate's testimony, the State called Douglas McAuliffe, a church elder, to supplement the record on this issue. McAuliffe testified that he had spoken to Johnson in 1987 about the allegation of sexual abuse because, as a church elder, he wanted to know what was going on. Johnson told McAuliffe that Plate had admitted sexually abusing K.V.A. McAuliffe testified that if the situation had not been satisfactorily resolved, then Plate's admissions would have been reported to the congregation.

Following this additional testimony, Judge Cranston again found that Plate's statements to Johnson were not intended to be confidential, and thus Johnson could testify about these statements.

On appeal, Plate argues that this was error. He contends that Judge Cranston improperly resolved the question of confidentiality by relying on Johnson's intent rather than on Plate's intent. This issue turns on the meaning of Rule 506(a)(2):

> A communication is confidential [for purposes of Rule 506] if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

Rule 506(a)(2) directs trial judges to determine whether a conversation was "made privately" and was "not intended for further disclosure". A trial judge confronted with this task might naturally ask, "Who among the participants to the conversation must intend that there be no further disclosure of the conversation?" Because Rule 506(a)(2) is phrased in the passive voice, it fails to provide a clear answer to this question.

■ The commentary to Evidence Rule 506 does not address this question, although it does state that the definition in 506(a)(2) is modeled after the definitions of "confidential communication" in Evidence Rule 503(a)(5) (attorney-client privilege) and Evidence Rule 504(a)(4) (physician-patient and psychotherapist-patient privileges). Consulting the commentary to Evidence Rule 503(a)(5), we again find the desired answer hiding behind the passive voice:

> The requisite confidentiality of communication is defined in terms of intent. A communication made in public or meant to be relayed to outsiders or which is to be divulged by the client to third persons can scarcely be considered confidential. *See La Moore v. United States,* 180 F.2d 49 (9th Cir.1950) [construing § 58–6–4 ACLA 1949]; *McCormick [on Evidence ]* (2d ed.) § 95. The intent is inferable from the circumstances. Unless intent to disclose is apparent, the attorney-client communication is confidential.

The commentary, like the rule, fails to specify whose intent controls the privacy of the conversation. However, in *Farrell v. Anchorage,* 682 P.2d 1128 (Alaska App.1984), this court indicated that the scope of the privilege is determined by the reasonable expectations of the person seeking the consultation. In particular, this court stated that "the scope of privacy accorded to an attorney-client conversation must in part depend upon the reasonable expectations of the client". *Farrell,* 682 P.2d at 1131 n. 3.

For instance, in *Blackmon v. State,* 653 P.2d 669 (Alaska App.1982), this court held that the attorney-client privilege prevented a state trooper from testifying to parts of an attorney-client conversation that he had overheard while guarding the defendant in court. The court found that the conversation was protected by the privilege because (1) the defendant "plainly . . . intended to have a secret conversation with [his attorney]" and (2) the defendant took "[r]easonable precautions . . . not to have the conversation overheard". *Blackmon,* 653 P.2d at 671. Summarizing its view of the matter, this court stated: "The essence of the lawyer-client privilege is . . . that the client reasonably intend his communication with counsel to be confidential." *Id.*

In one key respect, *Farrell* and *Blackmon* are not directly applicable to Plate's case. In both *Farrell* and *Blackmon,* there was no question that the attorneys and their clients shared the same expectation that their conversations were to be private. Plate's case, on the other hand, presents the issue of whether a conversation is privileged when the person who has come for the professional consultation and the professional who is being consulted have differing expectations con-

cerning the privacy of the conversation. Notwithstanding this difference, *Farrell* and *Blackmon* strongly suggest that the privacy of a communication is governed by the reasonable expectations of the person who is seeking the consultation.

We note that the privilege belongs to the person seeking the consultation with a lawyer, doctor, or clergyman. *See* Evidence Rules 503(b), 504(b), and 506(b). We further note that Evidence Rules 503, 504, and 506 use a "reasonable expectations" test to resolve a related issue: is a communication privileged if the person who has come for the consultation mistakenly believes that the person being consulted is a lawyer, a physician, or a clergyman? The answer, according to Evidence Rules 503(a)(3), 504(a)(2), and 506(a)(1), is that the communication is privileged if the person seeking the consultation reasonably believed that the person he or she was talking to was a lawyer, physician, or clergyman.

■ This "reasonable expectations" analysis, when applied to the clergy-communicant problem in Plate's case, suggests that the scope of the privilege depends on the reasonable expectations of the person consulting the clergyman. The person consulting the clergyman must believe that the conversation is to remain private, and the person's belief in the privacy of the conversation must be reasonable.

■ Federal case law supports this conclusion.[4] Exercising its authority under Federal Evidence Rule 501 to continue the common-law development of the evidentiary privileges, the Third Circuit defined the scope of the clergy-communicant privilege this way:

> [T]he privilege ... protect[s] communications made (1) to a clergyperson (2) in his or her spiritual and professional capacity (3) with a reasonable expectation of confidentiality.

*In re Grand Jury Investigation,* 918 F.2d at 384. The party asserting the privilege bears the burden of proving that the contested communication is protected by the privilege. *Id.* at 385 n. 15.

■ For these reasons, we conclude that Alaska's Evidence Rule 506(a)(2) should be interpreted to require the person claiming the privilege to prove four things: first, that he or she subjectively believed that the conversation with the clergyman was being held in private; second, that this belief was reasonable under the circumstances; third, that he or she intended that the communication not be disclosed to anyone except in furtherance of its purpose (obtaining spiritual guidance from the clergyman); and fourth, that he or she reasonably believed that this intention was shared by the clergyman.

Turning to the facts of Plate's case, the first and second elements are not disputed; both Plate and Johnson testified that their conversation was held in private. This leaves the third and fourth elements. Plate testified that he believed his conversation with Johnson would be held in confidence. Judge Cranston found that Johnson gave Plate no guarantee of confidentiality, or at most a conditional promise of confidentiality (that the conversation would go no further only if Plate underwent counseling to resolve his sexual mistreatment of his stepdaughter).

The problem here is that Judge Cranston's findings seem to be framed in terms of how Johnson viewed the conversation. Because two people can conceivably have differing, reasonable views of a conversation, Judge Cranston's findings are at least potentially consistent with Plate's testimony that he personally believed the conversation would be confidential. And neither Plate's testimony nor Judge Cranston's findings resolve the fourth element of Plate's claim of privilege: assuming that Plate subjectively expected his conversation with Johnson to be held in con-

---

4. Although Congress chose not to adopt specific rules governing evidentiary privileges, *see* Federal Evidence Rule 501, the United States Supreme Court's Advisory Committee proposed an Evidence Rule 506(a)(2) identical to Alaska's Evidence Rule 506(a)(2). Moreover, the Advisory Committee's commentary to this rule is identical to the Alaska commentary. Congress's decision not to adopt the 500 series of evidence rules did not necessarily indicate their disagreement with the proposed rules, but rather reflected a policy decision to leave that particular portion of the law of evidence uncodified. *In re Grand Jury Investigation,* 918 F.2d 374, 377 (3rd Cir.1990).

fidence, was Plate's expectation reasonable under the circumstances?

Judge Cranston was the finder of fact regarding Plate's claim of privilege. The judge was entitled to disbelieve Plate's testimony and find that Plate had no subjective expectation of confidentiality. However, Judge Cranston's ruling does not directly address the credibility of Plate's assertion. Instead, Judge Cranston's ruling is framed in terms of what Johnson expected.

Johnson's expectations concerning the conversation are relevant, but only to the extent that they were communicated to Plate. If Johnson told Plate that their conversation would not be held in confidence, or would be held in confidence only if certain conditions were met, this fact would clearly be important when assessing the credibility and the reasonableness of Plate's professed belief that the conversation was confidential. Compare *La Moore v. United States*, 180 F.2d 49, 54 (9th Cir.1950), in which the defendant claimed that a conversation was protected by the attorney-client privilege, but the other party to the conversation (the attorney) testified that he was not representing the defendant. The appeals court held that if, based on this testimony, the trial judge concluded that the defendant did not have a reasonable belief that the attorney was representing him, then the conversation was not protected by the attorney-client privilege.

On the other hand, if Johnson held a private, unexpressed intention to reveal his conversation with Plate if the sexual abuse problem was not properly resolved, this fact would not be inconsistent with Plate's claim of privilege. It is Plate's expectations that govern, so long as Plate's expectations were reasonable under the circumstances.

From the record before us, we can not tell how Judge Cranston resolved the two crucial issues: (1) what was Plate's subjective expectation regarding the conversation, and (2) if Plate subjectively believed that the conversation was to be confidential, was Plate's belief reasonable? We therefore can not resolve Plate's claim of privilege in this appeal. If Plate is retried, and if the State again offers Johnson as a witness, the superior court should renew its consideration of this issue and should enter findings that address the elements of the clergyman-communicant privilege explained in this opinion.

### Conclusion

The judgement of the superior court granting post-conviction relief to Plate and reversing his five convictions is AFFIRMED.

### Order

Upon consideration of the petition for rehearing filed by the State of Alaska:

■ The State argues that Plate failed to preserve an adequate objection to the seating of the alternate juror. The superior court found that Plate's objection was adequate to preserve this issue. Moreover, even if Plate's attorney could be faulted for failing to specify Criminal Rule 24 as the basis for his objection, we would find plain error.

■ The State argues that it would be improper to find plain error because Plate's attorney might have had a tactical reason for failing to cite Rule 24 when he made his objection. We find that the State has failed to preserve this argument. The State is appealing the superior court's grant of post-conviction relief. As the appellant, the State must show that its arguments for reversal were presented to the superior court. During the post-conviction relief proceedings, the State did not argue that Plate had failed to preserve the alternate-juror issue or that relief should be denied because Plate's attorney withheld an objection for tactical reasons.

In addition, because the State did not ask the superior court to find that Plate had a tactical reason to withhold the basis for his objection, Plate was not notified that this issue would be contested; he thus had no fair opportunity to litigate this issue. Under these circumstances, the State can not raise this claim for the first time on appeal.

For these reasons, IT IS ORDERED that the petition for rehearing is DENIED.

Entered at the direction of the Court.