**Evan E. RAMSEY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7295.**

Court of Appeals of Alaska.

Oct. 11, 2002.

Michael Dieni, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

COATS, Chief Judge.

A jury convicted Evan Ramsey of two counts of murder in the first degree,[1] one count of attempted murder in the first degree,[2] and fifteen counts of assault in the third degree.[3] Superior Court Judge Mark I. Wood sentenced Ramsey to a composite term of 210 years to serve. Ramsey appeals both his conviction and his sentence. We affirm in part and reverse in part.

On Wednesday morning, February 19, 1997, sixteen-year-old Evan Ramsey entered Bethel High School with a .12 gauge shotgun hidden under his jacket. Ramsey immediately walked toward the student common area where several students were sitting. At the nearest table sat Joshua Palacios, a fellow high school student, talking with several of his friends. Palacios began to turn around and stand up when Ramsey pulled out the shotgun and shot Palacios in the stomach. Palacios later died from his wounds. Two students who were sitting across from Palacios, S.M. and R.L., were also hit by pellets from the shotgun blast.

One of the art teachers at the high school, Reyne Athanas, was in the teacher's lounge when she heard the first gunshot. She entered the hallway and observed Ramsey shooting into the ceiling. She saw Palacios lying on the floor with another student. During this episode, Ramsey paced up and down the hall several times in a very threatening manner. She and Robert Morris, another school teacher, attempted to convince Ramsey to put the shotgun down and give up. Ramsey then aimed the gun at them, but did not shoot. Ramsey walked away from Athanas and Morris, heading in the direction of the school's main office where the school's administrative offices were located.

Meanwhile, Ronald Edwards, the school principal, had been walking through the school looking for Ramsey because he had heard that Ramsey was in the school with a gun. Edwards found Ramsey as he was approaching the main office. Ramsey aimed the shotgun at Edwards, and Edwards turned around to run back into the school's office. As Edwards was trying to get back into the office, Ramsey shot him in the back

---

**1.** AS 11.41.100(a)(1)(A).

**2.** AS 11.41.100(a)(1); AS 11.31.100(a).

**3.** AS 11.41.220(a)(1)(A).

and shoulder. Edwards died in his office from the gunshot wounds.

Minutes after the shooting began, Bethel police officers arrived at the high school. Several officers entered the high school and saw Ramsey standing in the common area with the shotgun. Ramsey saw the officers and fired one round in their direction. After a brief exchange of gunfire, Ramsey put the shotgun down and gave up. According to the officers, as he threw the shotgun down, Ramsey yelled "I don't want to die." Officers were quickly able to detain Ramsey and take him into custody.

A grand jury indicted Ramsey on two counts of first-degree murder, three counts of attempted first-degree murder, and fifteen counts of third-degree assault. The State's theory at trial was that Ramsey sought revenge against both Palacios and Edwards. The State introduced testimony that Ramsey and Palacios got into an argument and fight two years before the shooting. The State also introduced a letter found in Ramsey's bedroom following the shooting that indicated Edwards was one of Ramsey's intended victims. The letter read, in part,

> Hi, everybody. I feel rejected. Rejected, not so much alone. But rejected. I feel this way because the day-to-day mental treatment I get usually isn't positive. But the negative is like a cut, it doesn't go away really fast, they kind of stick. I figure by the time you guys are reading this, I'll probably have done what I told everybody I was going to do. Just hope a 12–gauge doesn't kick too hard, but I do hope the shells hit more than one person, because I am angry at more than one person. One of the big assholes is Mr. Ed—Ron Edwards, he should be there. I was told that this would be his last year, but I know it will be his last year. The main reason that I did this is because I am sick and tired of being treated this way everyday. Who gives a fuck about it? Now, I got something to say to all of those people who think I'm strange can suck my dick and like it.
>
> . . .

> Life sucks in its own way, so I killed a little and kill myself. Jail isn't for me ever and wasn't.

Ramsey's major defense at trial was that he was suicidal and did not form the requisite intent to commit first-degree murder or first-degree attempted murder. According to Ramsey, his intent during the shooting was not to kill anyone but merely to scare the people at the school and force the police to go to the high school and kill him. Ramsey's counsel described Ramsey's actions as "suicide-by-cop."

The jury convicted Ramsey of two counts of first-degree murder, one count of first-degree attempted murder, and fifteen counts of third-degree assault. The jury also acquitted him of two counts of attempted first-degree murder and one count of third-degree assault. Judge Wood sentenced Ramsey to a composite term of 210 years' imprisonment.

*Judge Wood's refusal to allow Ramsey to introduce evidence of past physical and sexual abuse*

In support of his defense, Ramsey asked the court's permission to introduce evidence of Ramsey's family history and history of past sexual and physical abuse committed against Ramsey while he was in foster care. Ramsey stated that he intended to argue that the history of a dysfunctional family combined with past incidents of physical and sexual abuse demonstrated why Ramsey was suicidal when he went to the high school with the shotgun. The State opposed the request and asked Judge Wood to preclude the proposed evidence as not relevant.

In his offer of proof, made immediately before his opening statement, Ramsey stated that in 1987 his father went to jail for ten years. After his father went to jail, his mother developed an alcohol problem. In 1988, the Department of Family and Youth Services (DFYS) removed Ramsey and his two siblings from his mother's custody. Following the removal, Ramsey's oldest brother, John Ramsey, was separated from Ramsey and the youngest brother, William. And finally, Ramsey and his younger brother were shuffled between ten different foster homes over a two-year period.

In support of his claim of past physical and sexual abuse, Ramsey stated that while Ramsey and William were in a particular foster home, the foster parents' biological son physically and sexually abused both Ramsey and William. The offer indicated that the biological son would come into the Ramsey' room at night to punch and pinch both Ramsey and William. During some of the incidents, the son would urinate into their mouths. According to the offer, a school nurse discovered the abuse and contacted DFYS. The offer claimed a subsequent investigation found that the abuse occurred and that DFYS removed the Ramsey brothers from the foster home.

Judge Wood agreed with Ramsey that his family history was relevant to explaining why Ramsey might feel suicidal, but noted that this was not precisely the issue. The charges against Ramsey required the State to prove that Ramsey acted with the intent to kill others. The fact that Ramsey might have *also* wished to kill himself would not be a defense. Alaska Statute 11.81.900(a)(1) declares that "when intentionally causing a particular result is an element of an offense, that intent need not be the [defendant's] only objective."

Although Judge Wood was willing to give Ramsey considerable latitude to introduce evidence of his past, Judge Wood believed that the proposed evidence of sexual abuse was too likely to distract the jury from the issues in the case. He believed that this potential for unfair prejudice would outweigh the probative value of the evidence—unless Ramsey could show that his past subjection to sexual abuse was (1) likely to make him suicidal and at the same time (2) *not* just as likely to make him homicidal.

When Judge Wood suggested that Ramsey would need expert testimony to establish this point, Ramsey replied that there was no need for expert testimony—that the inference was obvious. Judge Wood disagreed. Confronted with Judge Wood's ruling, Ramsey either could not or chose not to offer expert testimony on this point.

At the conclusion of the State's case-in-chief, Ramsey asked the court to reconsider its previous ruling about the sexual and physical abuse. Judge Wood declined to reverse his earlier ruling. He found that sufficient evidence had been introduced to allow Ramsey to argue his suicidal theory and to argue that Ramsey "wasn't thinking clearly" when he entered the high school. But he reiterated his finding that past incidents of physical and sexual abuse were not relevant to the case and found that, even if relevant, the incidents were more prejudicial than probative.

On appeal, Ramsey argues that Judge Wood abused his discretion because he should have taken judicial notice of the linkage between evidence of homosexual rape and the inclination to commit suicide. Ramsey contends that prior physical and sexual assaults have a clear tendency to show that Ramsey intended to commit suicide, not homicide.

■ A review of the record of the trial demonstrates that Ramsey was able to present substantial evidence about his background to support his defense. Ramsey presented testimony that his childhood was very difficult. Ramsey's oldest brother, John Ramsey, testified that he and his brothers were forced to move around often with their mother after their home burned down. This hardship was exacerbated when their father went to jail in 1986. Ramsey's mother developed a drinking problem, and DFYS removed the children from her care due to neglect. Once DFYS took custody of them, John Ramsey and his brothers were split apart. William, the youngest, testified how he and Ramsey bounced back and forth between several foster placements, ultimately ending up in Bethel, with Sue Hare. In addition to testimony about his family history, Ramsey also called W.N., a close friend, who testified that Ramsey threatened suicide two years before the shooting occurred. And, Kathryn Fritch, the mother of one of Ramsey's friends, testified that Ramsey expressed feelings of suicide and depression.

Judge Wood allowed Ramsey to introduce a substantial amount of evidence dealing with his family history and background. Furthermore, Judge Wood did not completely foreclose Ramsey from introducing the disputed

evidence concerning prior physical and sexual abuse. Rather, Judge Wood questioned Ramsey's premise that such abuse would tend to make a child suicidal but would not tend to make the child homicidal. Judge Wood told Ramsey that he could introduce the disputed evidence if he offered expert testimony to support this premise; otherwise, the judge concluded, the prejudicial effect of the evidence would outweigh its probative value. Ramsey never offered the expert testimony.

The question, then, is whether Judge Wood abused his discretion when he required Ramsey to offer foundational expert testimony to support his premise that a child's subjection to physical and sexual abuse would tend to make the child suicidal as opposed to homicidal—or whether, as Ramsey contended, this premise was self-evident and needed no foundational support. We hold that reasonable judges could conclude that this premise was not self-evident and that the proponent of such evidence would need to support it with expert testimony. Accordingly, Judge Wood did not abuse his discretion when he required this foundational testimony from Ramsey.

*Nurse Ford's testimony that Ramsey stated he was not suicidal during the initial health screening interview*

In rebuttal, the State called registered nurse Debbie Ford from the Department of Corrections. The State sought to rebut Ramsey's claim that he was suicidal during and after the shootings by showing that during an initial health screening at the jail, Ramsey denied any suicidal thoughts within the last year.

Ford testified that she asked Ramsey about his suicidal tendencies during an initial screening at the jail. The initial screening was held in Ramsey's holding cell that Ford described as a typical jail cell, six to eight feet by ten feet. She remembered two or three correctional officers in the holding cell with her during the initial screening. Ford testified that she was not qualified to make a psychological diagnosis of a patient but that the highest risk for a prisoner committing suicide was during his first twenty-four hours at the jail. The purpose of the initial screening and medical interview was to quickly assess and determine whether a prisoner posed a suicide risk or had any suicidal tendencies. During this initial screening, Ramsey denied that he any suicidal thoughts "at the present time." During the second interview, which was held at the medical center, Ford sat at a desk and Ramsey at the opposite end. Two correctional officers stayed in the medical center with Ford and Ramsey for safety reasons. They stood a few feet away from Ramsey. Again, Ramsey denied having any suicidal thoughts within the past year.

Ford stated that if a prisoner showed any suicidal tendencies, she referred the prisoner to the mental health clinician. In Ramsey's case, based on his age and the seriousness of his offense, she referred him to the mental health clinician following her medical screening, even though Ramsey denied any suicidal thoughts or attempts.

Ramsey contends that Judge Wood erred in allowing Ford to testify to his statements because his statements were covered by the psychotherapist-patient privilege. The privilege is set out in Alaska Rule of Evidence 504(b).

A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental or emotional conditions, including alcohol or drug addiction, between or among the patient, the patient's physician or psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

In order for the privilege to apply, the communication in question must be confidential.[4] Rule 504(a)(4) states that "[a] communication is confidential if not intended to be disclosed to third persons other than those present to further the interest of the patient

---

4. A.R.E. 504(a)(4).

in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family."

In *Plate v. State*,[5] we discussed when a communication was confidential and therefore qualified for the privilege. In *Plate*, we discussed the clergy communicant privilege set out in Evidence Rule 506 and what is meant by the term "confidential communication." We noted in our discussion that the definition of a "confidential communication" was the same in the attorney-client privilege set out in Evidence Rule 503(b), the psychotherapist-patient privilege set out in Evidence Rule 504(b), and the clergy-communicant privilege set out in Evidence Rule 506(b).[6] We concluded that, whether a communication was confidential depended on the reasonable expectation of the person consulting the lawyer, psychotherapist, or clergyman. The person "must believe that the conversation is to remain private, and the person's belief in the privacy of the conversation must be reasonable."[7]

■ Applying this test here, we conclude that a reasonable person in Ramsey's position would not believe that the contents of his conversation with Nurse Ford about his mental condition were confidential. The purpose of Nurse Ford's questions about whether Ramsey had suicidal feelings was clear: she wanted to find out if Ramsey was a suicide risk and asking Ramsey was the most direct way of obtaining this information. Also, it was clear that Nurse Ford would not have treated this information as confidential. Certainly if Ramsey had indicated that he was suicidal, Nurse Ford would have alerted anyone necessary to minimize this risk, including many people whose responsibility was to guard Ramsey, not treat him. And it is foreseeable that the correctional officers, if informed that Ramsey was a suicide risk, would widely disseminate this information to minimize any risk to Ramsey. We conclude

that Ramsey's communications to Nurse Ford about his mental condition were not confidential communications. Accordingly, Ramsey did not have the right to prevent Nurse Ford from testifying about his statements. Judge Wood, therefore, did not err in allowing Nurse Ford to testify about Ramsey's statements.

*Did Judge Wood err in instructing the jury on the charge of attempted murder of S.M.*

When Ramsey shot Palacios, S.M. and R.L., two students sitting across from Palacios, were also hit by pellets from the same shotgun blast. The State's theory was that if Ramsey, with intent to kill Palacios, shot and injured S.M., he committed attempted murder in the first degree against S.M. Ramsey objected, contending that he could only be guilty of the attempted murder of S.M. if he had acted with the specific intent to kill S.M. Judge Wood disagreed and instructed the jury that:

> In order to establish the crime of Attempted Murder in the First Degree as charged in Count III of the indictment, it is necessary for the state to prove beyond a reasonable doubt the following:
>
> First, that the event in question occurred at or near Bethel ... on or about February 19, 1997;
>
> Second, that Evan Ramsey intended to commit the crime of Murder in the First Degree as to Count II [First–Degree Murder of Palacios] and;
>
> Third, that the defendant shot S.M. with a firearm, which constituted a substantial step toward the commission of Murder in the First Degree.

Judge Wood allowed the State to argue in summation that if Ramsey had fired the shotgun at Palacios with the specific intent to kill him and had simultaneously injured S.M. (thereby taking a substantial step), Ramsey was guilty of attempted murder in the first degree of S.M. Judge Wood precluded Ramsey from arguing to the jury that the jury

**5.** 925 P.2d 1057, 1065–67 (Alaska App.1996).

**6.** *Id.* at 1066.

**7.** *Id.*

had to find that Ramsey had a specific intent to kill S.M. to find him guilty of the attempted murder of S.M. Ramsey contends that Judge Wood erred. We agree.

The parties point out that other jurisdictions that have addressed this or similar issues have reached entirely different results. Some jurisdictions hold that attempted murder is appropriately charged if the defendant's actions killed the intended victim and also injured an unintended victim as a matter of public policy and deterrence.[8] Other jurisdictions have held that attempted murder is an inappropriate charge under the theory that attempt, as an inchoate offense, requires the specific intent to kill a specific victim.[9]

■ The doctrine of transferred intent arose in early common law to impute criminal liability to a person who, acting with the intent to harm, caused injury to an unintended victim.[10] To avoid injustice, courts developed the theory of transferred intent, holding the individual responsible for the injury or death to the unintended victim. Most commentators, however, note that transferred intent is a misleading half-truth because at common law the requisite mental state was "malice aforethought," which included the intent to kill *anyone*.[11] These commentators note that the law, even at common law, did not require the ultimate person harmed be the intended victim.[12]

■ The doctrine of transferred intent is unnecessary to ensure criminal liability under Alaska's statute defining first-degree murder.

Alaska Statute 11.41.100 defines murder in the first degree as:

> (1) with intent to cause the death of another person, the person (A) causes the death of *any* person.

(emphasis added).

The plain language of AS 11.41.100 imputes criminal liability to anyone who, with the intent to cause death, causes death. The statute does not require the State to prove that a defendant had a specific intent to cause the death of a particular person to convict the defendant of murder. Therefore, under Alaska law, if a defendant acts with the intent to cause the death of another person, the defendant is guilty of murder for the death of any person whose death is caused by his act.

■ The question presented in this case is whether a similar rationale can be applied to attempted first-degree murder. To be guilty of attempted first-degree murder in Alaska, a person must (1) intend to cause the death of another, and (2) take a substantial step causing the death of *any* person.[13] The State argues that Ramsey intended to cause the death of Palacios and that his wounding of Palacios was a substantial step towards causing S.M.'s death.

The problem with the State's argument is that its logic leads to the conclusion that Ramsey could have been found guilty of the attempted murder of everyone in the school. The jury certainly found that Ramsey intend-

---

**8.** *See, e.g., Ochoa v. State*, 115 Nev. 194, 981 P.2d 1201, 1205 (1999); *State v. Fennell*, 340 S.C. 266, 531 S.E.2d 512, 517 (2000).

**9.** *See, e.g., Ford v. State*, 330 Md. 682, 625 A.2d 984, 998 (1993), *superseded by statute on other grounds as stated in Robinson v. State*, 353 Md. 683, 728 A.2d 698 (1999) ("'[T]ransferred intent makes a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim. Transferred intent does *not* make two crimes out of one. Where the crime intended has actually been committed against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims.''); *State v. Hinton*, 227 Conn. 301, 630 A.2d 593, 602 (1993); *People v. Bland*, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107, 1110, 1116–17 (Cal.2002).

**10.** *See Ochoa*, 981 P.2d at 1203–04; *see also*, 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.12(d), 399–402 (1986).

**11.** *See* LaFave & Scott, *Substantive Criminal Law* § 3.12(d), at 399–401; *see also Ward v. State*, 997 P.2d 528, 533 (Alaska App.2000) (Mannheimer, J. concurring) (citing Rollin M. Perkins & Ronald N. Boyce, *Criminal Law*, 921–23 (3d ed.1982)) (noting that, in most cases, the doctrine of transferred intent is an unnecessary fallacy).

**12.** *See* LaFave & Scott, *Substantive Criminal Law* § 3.12(d), at 400; Perkins & Boyce, *Criminal Law* at 921–22.

**13.** AS 11.31.100(a); AS 11.41.100 (emphasis added).

ed to cause the death of Palacios. And because his actions would have placed almost any reasonable person in the school in fear of serious physical injury, it is hard to say where the State's attempted murder theory would stop. A defendant can be found guilty of attempted murder whether or not he actually injures his intended victim. Therefore, the State's argument, carried to its logical extension, would allow it to convict Ramsey of the attempted murder of everyone in the building.

Alaska law authorizes a separate conviction for homicide or assault for every victim of a defendant's assaultive act. *See State v. Dunlop,*[14] (holding that a defendant who kills and injures several victims by one assaultive act is properly convicted of a separate homicide or assault for each victim); *see also Cooper v. State,*[15] (holding that a defendant who pointed a firearm at three police officers was guilty of three counts of assault). Thus, to determine Ramsey's crimes, we must assess Ramsey's physical acts and culpable mental state pertaining to each victim.

The jury found that Ramsey acted with intent to kill Palacios. Thus, his act of firing the shotgun at Palacios would constitute either attempted first-degree murder (if Palacios survived) or completed first-degree murder (if Palacios died). If, at the same time, Ramsey killed or injured one or more bystanders while he was trying to kill Palacios, Ramsey would be guilty of an additional crime for each of these bystanders—not an additional attempted murder, but rather an additional homicide if the bystander died or, if the bystander survived, either an attempted homicide or an assault, depending on Ramsey's culpable mental state with regard to that bystander.

Here, under the jury instructions that embodied the State's erroneous theory of attempted murder, the jury was asked to find whether Ramsey wounded S.M. while trying to kill Palacios. The jury so found. But the jury was not asked to decide other pertinent matters.

For instance, if Ramsey had intended to kill S.M. (in addition to Palacios), then Ramsey could properly be convicted of the attempted murder of S.M. (regardless of whether he injured S.M.). Even if Ramsey did not intend to kill S.M., if Ramsey inflicted serious physical injury on S.M., while trying to kill Palacios, he might properly be convicted of first-degree assault on S.M.[16] Alternatively, if Ramsey merely inflicted physical injury on S.M. (while trying to kill Palacios), he might properly be convicted of second-degree assault on S.M.[17]

Accordingly, we conclude that Judge Wood erred in instructing the jury and allowing the State to argue that it could convict Ramsey of attempted murder of S.M. if Ramsey intended to kill Palacios and simultaneously injured S.M. We conclude that the proper instruction would have required the jury to find Ramsey had the specific intent to kill S.M. before it could convict Ramsey of the attempted murder of S.M. Based on this rationale, Ramsey's conviction for attempted murder in the first degree must be reversed.

The State argues that, if we conclude that the jury was improperly instructed on attempted murder in the first degree, we should remand the case to the trial court with directions to enter a verdict for assault in the first degree.[18] The State contends that, under the court's instructions, it is clear

14. 721 P.2d 604 (Alaska 1986).

15. 595 P.2d 648 (Alaska 1979).

16. Ramsey could be charged under AS 11.41.200(a)(1): reckless infliction of serious physical injury by means of a dangerous instrument. Ramsey could also conceivably be charged under AS 11.41.200(a)(2): acting with intent to cause serious physical injury to another, and causing serious physical injury to anyone. The latter theory rests on the premise that a person who acts with intent to kill necessarily acts with the lesser culpable mental state of intent to cause serious physical injury.

17. Ramsey could be charged under AS 11.41.210(a)(1): acting with intent to cause physical injury to another, and causing physical injury to anyone by means of a dangerous instrument. Again, this theory rests on the premise that a person who acts with intent to kill necessarily acts with the lesser culpable mental state of intent to cause physical injury.

18. *See Nix v. State,* 624 P.2d 823, 825 (Alaska App.1981).

that the jury had to find that Ramsey recklessly caused serious physical injury to S.M. with the shotgun and that this would constitute assault in the first degree.[19] But we agree with Ramsey that the record does not conclusively establish that the jury found that Ramsey caused serious physical injury to S.M. Consequently, all we can say with certainty is that the jury had to have found that Ramsey committed the crime of assault in the second degree, which requires the State only to prove that Ramsey, with the intent to cause physical injury to Palacios, caused physical injury to S.M.[20] On remand, the State is entitled to the entry of a verdict against Ramsey for the offense of assault in the second degree. Or, if the State elects, the State can retry Ramsey for attempted murder in the first degree or any lesser offense.[21]

*Sentencing issues*

Lastly, Ramsey contends that Judge Wood made a mistake in determining when he would be eligible for discretionary parole. He points out that Judge Wood appears to have assumed that Ramsey would be eligible for discretionary parole after he had served one-fourth of his sentence. Ramsey points out that he will not be eligible for parole until he had served at least one-third of his sentence.

Since we have reversed Ramsey's conviction for attempted murder in the first degree, on remand, Judge Wood will be required to resentence Ramsey. We therefore conclude it is unnecessary for us to address Ramsey's contention that Judge Wood incorrectly relied on his parole eligibility because we are already remanding the case for resentencing.

Ramsey's conviction for attempted murder in the first degree is REVERSED. His other convictions are AFFIRMED.

---

**19.** AS 11.41.200.

**20.** AS 11.41.210(a)(1) provides that "a person commits the crime of assault in the second degree if ... with intent to cause physical injury to another person, that person causes physical injury to another person by means of a dangerous instrument...."

**21.** *See Nix,* 624 P.2d at 824–25.